·No. 27.—JAMES WILDER, plaintiff in error, *vs.* H. H. LUMPKIN;
defendant in error.

[1.] The Act of the Legislature of the 29th of December, 1847, which declares
that, from and after its passage, it shall not be necessary to make securities on
appeal and injunction bonds parties to writs of error—*Held*, not to be appli-
cable to cases occurring before its passage and pending at the time.

[2.] The clause of the Constitution of the United States and of the State of
Georgia, which prohibits *ex post facto* laws—*Held*, to apply to criminal laws
alone.

[3.] Retrospective laws which are not *ex post facto* in their character, and which
do not impair the obligation of contracts, are not ·within the prohibitions of
the Constitution.

[4.] The Legislature may pass retrospective laws, and the Courts may enforce
them, provided they are not *ex post facto* in their character—do not impair
the obligation of contracts—divest no antecedently vested rights, and are not
violative of the great fundamental principles of the Social Compact.

[5.] Retrospective laws, which divest previously acquired rights, although such
as are not within the prohibitions of the Constitution, are upon the same posi-
tion, as to principle, with *ex post facto* laws; and, if enacted by the Legis-
lature will not be enforced by the Courts.  And are farther void, because in
conflict with the fundamental principles of our Government.

[6.] Laws which act upon remedies alone, although retrospective, will be en-
forced; provided they do not impair the obligation of contracts, or disturb
absolutely vested rights; and only go to confirm rights already existing, and
in furtherance of the remedy, by curing defects and adding to the means of
·enforcing existing obligations.   The Act of the 29th of December, 1847, is
not within these provisos.

[7.] Motion to reinstate the case, after the writ of error dismissed, refused

Motion to dismiss writ of error.   Heard before the Supreme
Court at Macon, February Term, 1848.   Also, motion to rein-
state the case after the writ of error dismissed.   Tried same
Term.

His Honor, Judge LUMPKIN, gave no opinion, the defendant
in error being a relative.

On motion to dismiss writ of error, KING & GORDON appeared
as counsel for the plaintiff, in opposition to the motion, HARMON
& TRIPPE, for the motion.

On motion to reinstate,—STARKE, for plaintiff, HARMON &
TRIPPE, for defendant.

For the grounds of the respective motions before mentioned, see the opinion delivered by the Supreme Court.

*By the Court*—NISBET, J. delivering the opinion.

A motion was made in this case to dismiss the bill of exceptions and writ of error, because the security on the appeal was not made a party. Henry H. Lumpkin had obtained judgment against James Wilder, the plaintiff in error. and his security on the appeal. Wilder brought a writ of error, without joining his security, against whom judgment had passed equally with himself. The reply to the motion to dismiss was an Act of the last Legislature, which declares that, from and after its passage, it shall not be necessary to make securities on the appeal parties to writs of error before this Court. Not only was the judgment of the Circuit Court, upon which error was charged, pronounced before the passage of the Act, but the plaintiff's suit, upon his writ before this Court, was pending at the time it bears date.

[1.] According to the law, as it stood at the time this writ of error was brought, and at the time the Act of the Legislature was passed which repealed it, Henry H. Lumpkin had the right to require the security on the appeal to be joined as a party plaintiff before this Court. He had recovered judgment in the Court below against two defendants, one of whom could not bring the writ. Let it be noted that such was the law, not alone by the decision of this Court, which might be quite sufficient, it being a judgment of the highest judicial tribunal known to the laws of Georgia,—but such was the law as held by the highest judicial tribunals of our sister States, and by the Supreme Court of the United States. And not only so, but such was the rule by the Common Law, as we adopted it, and therefore as much the law governing the rights of parties, and as obligatory upon this Court as if it had been embodied in the statute which organized it. It was not a mere rule of practice, adopted for convenience, but an established rule of right, obligatory upon the Courts, and the people of this State. A rule, too, founded in reason and good sense. What was the reason of the rule as it existed at Common Law, whence we derived it, as applicable to precisely such a case as is this case? I have stated that where a party has judgment against several, he is not compelled at Common Law to join issue

upon a writ of error brought by one defendant, but may dismiss his writ upon motion. The reason is, "for otherwise this inconvenience would ensue, that every defendant might bring a writ of error by himself, and by that means delay the plaintiff from his execution for a long time, and from having any benefit from his judgment, though it might be affirmed once or oftener." *Tidd's Practice*, 1136. *Carth.* 8. 3 *Burrow*, 1789. To make the rule applicable, it is necessary that the defendants be in life and be aggrieved by the judgment. By our law the judgment passes equally against the security on the appeal with his principal,—he is equally bound by it to the plaintiff,—its lien attaches equally upon his property. He is necessarily, therefore, presumed to be, until the contrary appears, aggrieved—and he was in life. By the law, too, organizing this Court, where the judgment of the Court below is for a sum certain, and it is affirmed by this Court, the plaintiff may enter up judgment in the Court below against the defendant and *his securities*, for principal. interest, costs and damages. *Act of* 1845, *Sect.* 5. 1 *Kelly*, 8. This, then, is the case to which the rule applies. To this rule the parties were amenable when this writ was brought. The right which Lumpkin had under that rule, was *not to be delayed in the enforcement of his judgment longer than the time necessary to hear and determine one writ of error by all the defendants*. If the late Act of the Legislature applies to this case, then of that right he is divested. For that Act, whilst it declares that it shall not be necessary to make securities on the appeal parties to writs of error, does not inhibit the security from bringing his several writ, and thus subjects the plaintiff to the very wrong from which he was protected by the Common Law. In support of the rule, as established by this Court, see farther: 6 *Co.* 25. *Cro. Eliz.* 648-9. *Yelv.* 4. 3 *Mod.* 134. 1 *Ld. Raymond*, 71, 151. 5 *Mod.* 16, 69. *Carth.* 367. *Comb.* 354. *Holt*, 54. 1 *Ld. Raymond*, 244. *Carth.* 404. 1 *Salk.* 319. 5 *Mod.* 358. 6 *Mod.* 40. 1 *Stra.* 234. 1 *ibid*, 606. 8 *Mod.* 305. *Cas. Tem. Hardee*, 135. 6 *Barnes*, 202. 1 *Wils.* 88. 2 *Dunf. & East*, 737. 2 *Kelly*, 440, 441.

The Legislature did not, as we think, intend this Act to have any retroactive effect. It is in the following words : "Be it enacted, &c., *that from and after the passage of this Act*, it shall in no case be considered as necessary to join, with the parties to the suit of the Superior Court, carrying a case from there up to the Su-

preme Court by bills of exception and writs of error, the security on appeals, or any injunction bond."

" Section 2. That no writ of error shall be dismissed or delayed in its hearing and decision, where the parties to the writ or declaration below are included in said writ of error."

If it had been the intention of the Legislature to cause this Act to retrospect, or to embrace cases pending, we have a right to presume that they would have so declared. It is not to be presumed that they would have left the exercise of so dangerous a power—a power the exercise of which has been so rarely attempted—to conjecture or construction. That they did contemplate retrospective operation is negatived by the fact, that by the terms of the Act, it is made to take effect *from and after its date.* It does not differ from any other Act which declares what the *law shall be.* It is prospective, and as such this Court will give it full effect.

A distinction is sometimes sought to be drawn between a declaratory statute and one which enacts a new rule of law. The former being considered by some as free from the objections which so justly lie against retroactive laws in general. If not obnoxious to the same, it is to equally fatal objections. If a statute or a principle of the Common Law be of such doubtful import —if its meaning be so obscure as to constitute no intelligible rule of action, and the Legislature undertakes to give an exposition of it, then such exposition amounts to one of two things—either a new rule or a judicial construction of an existing rule. If the former, it is, as I shall undertake to show, without retrospective effect, and if the latter, it is the exercise of a power which belongs to the Legislature of no free country—which most assuredly does not belong to the Legislature of Georgia. By the fundamental principles upon which our political system is founded, all the departments of the Government are distinct—their powers are defined with careful exactness—their boundaries are marked with precision and clearness. It is necessary to the entire system that each should be confined to its proper sphere, and that no one should infringe the rightful functions of others. This separation and independence of the legislative, judicial and executive departments, is the chief glory and distinguishing excellence of the free institutions under which it is our happiness to live. Upon the judiciary devolves, more than upon any other branch of the

Wilder *vs.* Lumpkin.

Government, the preëminent and most serious obligation of holding the departments steadily to their respective spheres. *That* is the balance wheel of the machine. The obligation must be met and fulfilled—with firmness, yet with laborious carefulness—with forbearance and moderation, and with a profound sense of the consequences which may result from rashness on the one hand, or timidity on the other. The rule laid down by the Supreme Court upon the subject of unconstitutional laws, is most salutary, and that is that no law should be declared unconstitutional upon implication and conjecture. The opposition between the Constitution and the law should be such as to produce a *clear and strong conviction* on the mind of the Judge, that the law and the Constitution are in conflict. *Fletcher vs. Peck*, 6 *Cranch*, 87. The same rule ought to obtain when the Courts assume to deny, as they may do, to the Legislature the exercise of a function which appertains to the judiciary, or the exercise of a power, which although not within the prohibitions of the Constitution, is yet inconsistent with those principles of right and justice which lie at the foundation of all free government. Suppose, then, that the Act we are considering be declaratory of a doubtful rule of the Common Law relative to the joinder of parties plaintiffs to writs of error, would such declaration be the law of a case pending at the time it is made—the law of this case? Would this Court be bound to respect it, as obligatory upon them? Whilst we may admit that there may be cases in which a declaratory statute may be allowed to retroact—indeed, whilst we admit that there are cases where a new law may take effect retroactively, yet this is not one of them. A legislative exposition of a doubtful law is the exercise of a judicial power, and if it interferes with no vested right, impairs the obligation of no contract, and is not in conflict with the primary principles of our social compact, it is in itself harmless and may be admitted to retroactive efficiency. But if rights have grown up under even a law of somewhat ambiguous meaning, then the universal rule of our system—indeed of the English system of government, and of other systems which approximate to free government, applies. That rule is, the Courts declare what the *law is*—the Legislature declares what the law *shall be*. This rule has its application, as a general proposition, to all laws. It is the staunchest bulwark of freedom—the strongest of all the barriers which human experience

has been enabled to erect against the encroachments of tyranny upon the rights of man. I can imagine no more perfect embodiment of tyranny, than the power in one and the same functionary, whether legislature, king, emperor, prince or proconsul, to make the laws and to expound them. In such a case there is no limitation of power—no responsibility—no prescription of law—no security for property, franchise, person or character—all depends upon the whim, caprice or passion of the tyrant.

Forcibly and clearly does Chancellor Kent, in *Dash vs. Vankleek*, announce the conclusions of his great mind upon this subject: "But," says he, "if it [a statute of New-York] be considered as an exposition of the former Acts for the information and government of the Courts in the decision of causes before them, it would then be taking cognizance of a judicial question. This could not possibly be the meaning of the Act, for the power that makes is not the power to construe the law. It is a well-settled axiom that the union of these two powers is tyranny. Theorists and practical statesmen concur in this opinion. Our government, like all other free governments upon this continent, and like the only free government at present remaining in Europe, consists of departments, and contains a marked separation of the legislative and judicial powers. The Constitutions of several of the United States, and, among others, those of Massachusetts and Virginia, have an express provision that the legislative and judicial powers shall be presented separate and distinct, so that one department shall not exercise the functions belonging to the other.   *   *   *   *
And if it be not found in our own Constitution, in terms, it exists there in substance—in the organization and distribution of the powers of the departments, and in the declaration that the *supreme legislative power* shall be vested in the Senate and Assembly. No maxim has been more universally received and cherished as a vital principle of freedom. And without having recourse to the authority of elementary writers or to the popular conventions of Europe, we have a most commanding authority in the sense of the American people that the right to interpret laws does and ought to belong exclusively to the Courts of Justice." 7 *Johns. R.* 507-8.

The State of Georgia, like Virginia, Massachusetts and other of the States, has declared in her fundamental law, that her departments of government shall be distinct. The first section

of the first article of the Constitution announces that " The legis-
lative, executive and judiciary departments of government shall
be distinct, and each department shall be confided to a separate
body of magistracy; and no person or collection of persons, being
of one of those departments, shall exercise any power properly
attached to either of the others, except in the instances herein ex-
pressly permitted." *Prince*, 902. So, then, if the Act of 1847
be viewed in the light of a declaratory statute, it does not govern
this case—we do not recognize the power in the Legislature so
to construe the Common Law as to affect by that construction
rights which accrued to Mr. Lumpkin under it before the passage
of that Act. What his rights were, and the reason of them, I have
already shown. But farther—I do not consider that the Legisla-
ture viewed this Act in that light. We have a right to assume
that the Legislature knew what the Common Law was——a con-
trary presumption would be unjust to that body, whether consid-
ered as individual citizens or as a department of the government.
They knew that the rule of the Common Law was not doubtful,
but settled, and acquiesced in, both in England and in this coun-
try. They did not intend to make a construction of the old law,
but to establish a new rule. 2 *Cranch,* 272. 3 *Caines,* 69.

[2.] Can this new rule retrospect? is the enquiry that remains.
Can it be made to apply to this case? And first, it may be said
that it may, because it is not within the prohibitions of the Consti-
tution,—it is not an *ex post facto law,*—nor is it a law impairing the
obligation of a contract. I believe it is well settled—so consid-
ered since the case of *Calder vs. Bull* before the Supreme Court
of the United States in 1798—that the prohibition in the Constitu-
tion against the passage by the State Legislatures of *ex post facto
laws,* does not relate to the rights of the citizen, either of proper-
ty or of contract. Its object has been repeatedly adjudged to be,
to protect the person of the citizen from punishment by legisla-
tive acts having a retrospective operation. Blackstone's definition
has been recognized as the meaning of *ex post facto*, as used in
the Constitution of the Union, and the States where it is found.
It is considered as referring to penal laws, and had its origin in the
jealous regard of the people of the United States for personal lib-
erty, and their well-founded hatred of the laws of attainder and
confiscation, which disgraced the governments of the old world.
As to what laws fall within this constitutional prohibition, with a

full exposition of its meaning, see the opinions of the Supreme Court Bench in the case last referred to. It is admitted that this law, not being penal, does not fall within this prohibition, as construed by the highest tribunals of our country. See *Calder vs. Bull*, 3 *Dallas*, 386. *Fletcher vs. Peck*, 6 *Cranch*, 138. *Ogden vs. Saunders*, 12 *Wheat.* 266. *Satterlee vs. Mathewson*, 2 *Peters' S. C. R.* 380. *Watson, et al. vs. Mercer*, 8 *Peters' S. C. R.* 110. 1 *Kent Com.* 381, 382. 3 *Story Com. on the Constitution*, 212, sect. 1339. 2 *Elliot's Debates*, 343, 352, 354. *By Law, Judge, in Forsyth vs. Marbury*, *R. M. Charlton's R.* 326.

[3.] Nor do we claim that the Act of the Legislature falls within that prohibition of the Federal Constitution which is levelled against laws which impair the obligation of contracts. A subtle process of reasoning might, it is true, go a great way to establish a contract between Lumpkin, the plaintiff in the Court below, and the defendants to his judgment, by operation of law, by virtue of which they would be bound, if they came into this Court upon a writ of error to reverse his judgment, to come together. And farther, to show that if Lumpkin is amenable to the Act of the last Legislature, the obligation of that contract is impaired. But we do not rest this case upon that ground. We admit that the law does not come within that prohibition. Laws of the State Legislatures which do, are void. With the admission now made, it would be foreign to the necessities of this case to go into the learning with which the American books are crowded upon this subject.

[4.] We mean to say, then, that the Act of the General Assembly cannot be made to apply to this case, without giving it a *retrospective* operation, because the rights of Mr. Lumpkin, as defendant in error, existed anterior to, and the writ of error was pending at the time of, its passage. That thus to give the law a retrospective operation, would be to divest rights which had already vested in the defendant in error. And that to do so, would be the exercise of a power which does not belong to this Court. We have seen that the Legislature could not have intended to make this law retrospective—had they in terms declared that it should embrace pending cases, why, then, the question might have been less free from embarrassment. *Then*, however, I would not have hesitated to declare the law, as to all such cases, a nullity. *Now*, the power of this Court is invoked to give a retroactive ef-

ficiency to a law which was obviously intended to be prospective only. Believing, as we do, that the law was expected to be only prospective, this case does not give rise to any conflict between the Legislature and the Judiciary. This Court is asked to do what the Court of King's Bench, in the teeth of the vaunted omnipotence of the British Parliament, refused to do. To-wit: to adjudge a case according to a law passed after it was commenced. As early as the reign of Charles II., in a case which sprang up under the statute of frauds and perjuries, it was solemnly determined that the Court would not give retrospective action to a statute, so as to affect a *right of action* which accrued to a party prior to the time when the statute, by its terms, was to take effect, although the suit was not commenced until after that time. The case was this : The statute of frauds enacts, "that from and after the 24th of June, 1677, no action shall be brought whereby to charge any person, upon an agreement made upon consideration of marriage, unless such agreement or some memorandum or note thereof shall be in writing," &c. A parol promise upon consideration of marriage, was made before the 24th of June, 1677, and an action brought upon it afterwards. The statute was plead in bar, and the Court held that the statute extended only to promises made after the 24th of June, 1677, and *that the Act could not have a retrospect to take away an action to which the plaintiff was before entitled. Gilmer vs. Shooter,* 2 *Shower,* 16. 2 *Mod.* 310. 2 *Sev.* 237. 1 *Ventr.* 330. This case has a particular relevancy to the case at this bar, in this, that the *right* in the English case was a *right of action,* and the right in this case is not right of action in the plaintiff, but a right of like character in principle, to-wit : a right of defence in the defendant. Again, in the reign of George III., in *Couch vs. Jeffries,* Lord Mansfield declared the same doctrine. That was a *qui tam* action to recover a penalty for not paying the stamp duty on indentures of apprenticeship. A verdict was had for the plaintiff, and a motion made to restrain him from entering up judgment, upon the ground that the defendant had paid the duty, pursuant to an Act passed since the verdict, which discharged from the penalty all persons, who having incurred it, would pay the duty before a given day. It was argued for the plaintiff that the Act extended only to actions to be brought *in futuro,* and that he had a vested right in the penalty. For the defendant it was said : the Act has no proviso to save actions al-

ready brought, and therefore it extends to them; the Court will not add such a proviso when the Legislature has omitted it; and that the words of the Act were very strong, to-wit : that the person paying the duty, &c., *shall be acquitted and discharged of and from the said penalties.* Lord Mansfield said, "Here is a right vested. And it is not to be imagined that the Legislature could, by general words, intend to take it away from the person in whom it had so legally vested," &c. 4 *Burrow,* 2460. *Here* also it may be said, there is no proviso to save pending actions, and the Court will not add one—that the words of the Act are very strong, &c. To all of which we reply, as Lord Mansfield replied to Mr. Ashurst, " Here is a right vested," &c. The doctrine of the Common Law is *nova constitutio futuris formam imponere debet, non præteritis.* 2 *Inst.* 292. 6 *Bac. Ab.* 370. 1 *Black. Com.* 44. Puffendorf asserts the principle strongly in the following words : " A law can be repealed by the lawgiver, but the rights which have been acquired under it while it was in force, do not thereby cease. It would be an act of absolute injustice to abolish with the law all the effects which it has produced, (*Droit de la Nat. L. I. ch.* 6, *s.* 6,) and it is embodied in the Civil Code of France. *Code Civil des Français, No.* 2.

If vested rights are thus sacredly regarded and effectually protected in monarchial England and regal France, with what greater solemnity ought they not be considered in republican America ! According to our views of government it is in all its departments a trust. Presidents, Legislators and Judges are but agents, created by, and responsible to, the people. The citizen, and not the ruler, is the object of prime consideration—his liberty—his property—his contracts—and his rights, are the peculiar objects of governmental protection. One of the ends of government, as we have declared, is to *establish justice,—justice* between individuals. *My rights by our rights,* according to the compact of government into which the people of this Union have entered, are to be established and guarded from encroachment—are to be protected from foreign violence, the assaults of our own rulers, and from individual aggression.

[5.] I have already admitted that this law is not within the prohibitions of the Constitution of the United States, nor is it within the prohibitions of the State Constitution. It has been decided by the Supreme Court, that laws of the States, which by retro-

spection divest rights which have antecedently vested, are not against the Constitution of the United States, provided they do not impair the obligation of contracts, and do not partake of the character of *ex post facto* laws. *Satterlee vs. Mathewson,* 2 *Peters,* 413. *Watson vs. Mercer,* 8 *Peters,* 110. *Charles River Bridge vs. Warren Bridge,* 11 *Peters,* 539, 540. This decision, and the admissions I have made, divest this law of all objection derived *immediately* from the Constitution. I do not deny but that the Legislature may rightfully pass some retrospective laws—Acts, for example, of oblivion or pardon—or which, whatever be their character, neither impair the obligation of contracts, nor are within the prohibition against *ex post facto* laws, nor divest rights antecedently existing, nor violate the fundamental principles of our Social Compact. But laws retrospective, although they are not *ex post facto,* and impair not the obligation of contracts, which divest rights, or which are palpably in conflict with, (to use the language of Chase, J. in *Calder vs. Bull,*) "the great first principles of the Social Compact," the Legislature cannot rightfully enact, and if enacted, the Judiciary will not enforce. The power is denied upon principles which lie lower than the Constitution itself—principles upon which that instrument is based—which constitute the foundations of the government—principles of right, found in the mind of all enlightened and good men—of universal application, and unchanging as the source from whence they come, the bosom of the Deity. It is curious to see with what reluctance the Courts of Justice give in to the idea that the *ex post facto* clause in the Constitution should be confined to penal laws. The minds of some of our greatest jurists seemed to chafe in the technical fetters which bound them. Thus Patterson, Justice, in *Calder vs. Bull* says:— "I had an ardent desire to have extended the provision in the Constitution to retrospective laws in general. There is neither policy nor safety in such laws, and therefore I have always had a strong aversion against them. It may in general be truly said of retrospective laws of every description, that they neither accord with sound legislation, nor the fundamental principles of the Social Compact. But, on full consideration, I am convinced that *ex post facto* laws must be limited in the manner already expressed. They must be taken in their technical, which is also their common and general acceptation, and not to be understood in their literal sense." Mr. Justice Johnson, in *Satterlee vs. Mathewson,*

2 *Peters*, 414, designates the limitation as an "*unhappy idea.*" Mr. Justice Story intimates that if the question were now open, it would be a doubtful one.  3 *Story's Com. on the Constitution*, 212.  Chancellor Kent, in *Dash vs. Vankleek*, remarks: "An *ex post facto* law, in the strict technical sense of the term, is usually understood to apply to criminal cases, and this is its meaning when used in the Constitution of the United States, yet, laws impairing previously acquired *civil* rights, are equally *within the reason* of that prohibition, and equally to be condemned.  We have seen that the cases in the English and the civil law apply to such rights, and we shall find, upon farther examination, that there is no distinction in principle, nor any recognized in practice, between a law punishing a person criminally for a past innocent act, or punishing him civilly by divesting him of a lawfully acquired right.  The distinction consists only in the degree of the oppression," &c.  Judge Law, of our own State, in *Forsyth vs. Marbury, R. M. Charlton's R.* 328-9, in an opinion, which for learning compares well with those of the ablest men of our country, remarks: "These words, *ex post facto*, as defined by Blackstone, and as understood and explained by all the judicial tribunals, both State and Federal, have been so universally applied to *criminal*, in exclusion of *civil* law, that however *just and necessary* the extension of their sense and meaning, to embrace the latter, *might seem to me*, I could scarcely feel myself at liberty so to adjudge."  To the construction of this clause, so decisively settled, this Court yields.  We believe, however, that retrospective laws which divest previously acquired rights, upon principle, occupy the same position with *ex post facto* laws, and such, we apprehend, will be found to be the result of all, or nearly all, the authorities.  2 *Cranch*, 272.  1 *Bay*, 179.  4 *Serg. & Rawle*, 401. 12 *Ibid*, 363, 372.  2 *Gallison*, 105.  8 *Wheat.* 493.  1 *New Hamp. R.* 199.  1 *Aik.* 121.  2 *Greenleaf*, 28.  2 *Peters' S. C. R.* 657-8.  1 *Blackford, Ind. R.* 220.  1 *Harrington D. R.* 77.  *R. M. Charlton R.* 333.  2 *Alab. R. N. S.* 54.  1 *Kent's Com.* 454-5.  7 *Johns. R.* 477.  4 *Wheat. R.* 578, *note.* 12 *Ibid*, 286.

But aside from authority derived indirectly from the Constitution, such laws are forbidden by the nature of republican governments, and are opposed to the fundamental principles of our Social Compact.  They defeat the *justice* which government in this country is designed to establish.  No government can be pre-

sumed to possess the transcendental sovereignty to take away vested rights but for the public use, and that upon payment of an equivalent. The fundamental principles of free government require that private rights be held sacred. *Story's Com. on the Constitution, vol.* 3, *p.* 268. 6 *Cranch*, 67, 134. 2 *Peters*, 657. 9 *Cranch*, 43. 1 *Nott & McCord*, 26. 1 *Kelly*, 608. 2 *Peters*, 380, 413, 414. 9 *Cranch*, 535. *Seargent on the Constitution, ch.* 28, 30. 1 *Kent's Com.* 456, *note.* 7 *Johns. R.* 506.

[6.] But it is argued that laws which relate alone to remedies, are not obnoxious to these principles, and that the law of the Legislature under review, acts alone upon the remedy of the plaintiff in error in prosecuting his rights before this Court. It is true that remedial statutes may operate retrospectively, provided they do not impair contracts, or disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy, by curing defects and adding to the means of enforcing existing obligations. The Legislature cannot take away all remedy, for that would impair a contract and defeat a right. But every change and modification of the remedy does not involve such a consequence. The Legislature may vary the nature and extent of the remedy so always that some substantive remedy be in fact left. Such, I apprehend, are the rules which generally obtain upon this branch of the subject. *Story's Com. on the Constitution, vol.* 3, *pp.* 250, 251. 1 *Kent's Com.* 454, 455. 10 *Serg. & Rawle*, 101. 16 *Ibid*, 35. 17 *Ibid*, 64. 7 *Watts*, 300. 16 *Mass.* 245. 9 *Mass.* 360. 18 *Maine R.* 109. 4 *Wheat.* 200, 207. 12 *Wheat.* 378. 3 *Peters*, 280. Now it is said that the Act of the Legislature makes it simply unnecessary to make securities on the appeal, and on injunction bonds, parties to writs of error before this Court—that it therefore relates alone to the remedy, that it does not destroy the remedy of the plaintiff in error, nor does it impair it. But on the contrary it makes it more easy and available. This is all true so far as the plaintiff in error is concerned. He certainly has no cause to complain of the Act. But how is it with Mr. Lumpkin, the defendant in error? By the modification of the plaintiff's remedy, he is divested of a right----a right at Common Law, founded upon good reason, to-wit: the right of requiring the joinder of all the defendants to a judgment in his favor. Thus legislating upon the remedy, his right is divested. Suppose the verdict in this case had been for the defendants, and the plaintiff

below, Lumpkin, had brought a writ of error.  By the law as it was before the passage of this Act, he would have been compelled to make both the defendants below defendants in error.  Because the rule of this Court was, and so is the rule at Common Law, that all persons must be made parties to the pleadings in this Court who may be affected by its final judgment.  In that event, had the security on appeal been omitted, the act of the Legislature could not have precluded the defendant from dismissing the writ, because it, although acting alone on the remedy, would have interfered with the antecedent rights of the security.  So that the motion to quash this writ must prevail.

[7.] The writ being dismissed in this case, on a subsequent day of the same Term a motion was made to reinstate it, the security on the appeal having, under the rule of this Court, consented to become a party.  The motion was disallowed.  The dismission of the writ is a judgment of affirmance.  The case was called and heard in its order—the minutes of the Court for the day were closed, and no reason is given for the motion, but the plaintiff's misapprehension of the Act of the last Legislature.  The motion comes too late.  We cannot now open the judgment.  Such a practice would introduce irregularity and confusion into the business of this Court.  If this motion be allowed, then a precedent would be established by which, at any time during the Term, all judgments rendered on defective pleadings might be opened.