DYSON, ordinary, *vs.* POPE.

1. An ordinary, in acting on an election involving the question of "fence or no fence," is sitting for county purposes, and therefore an application to him for proceedings in connection with the examination and counting of the returns of such an election should be in writing, and plainly and distinctly set forth the ground of the proceeding desired.   In the absence of any application to the ordinary in writing, a *mandamus* should not be, issued to compel him to act.   Mere conversations between counsel and the ordinary on the subject are not sufficient.

2. Questions relating to examining and counting the returns in an election to settle the question of "fence or no fence," must be made before the ordinary proclaims the result.

3. In a county election on the question of " fence or no fence," the managers for the precincts (the militia districts) must consolidate the returns and then turn them over to the ordinary, for that officer to hear and determine questions which may arise under Code §1455, and proclaim the result.

4. An election to determine the question of "fence or no fence" must be held at the court-ground of each militia district, and no person shall be allowed to vote at said election except in the militia district in which he resides.   Where the election for two adjoining

districts was held at the court-ground of one of the districts, and it did not appear how many of the votes so cast were from the respective districts, there was no error in rejecting the entire vote so cast.

(*a.*) A provision requiring voters to cast their votes in their own districts is not in conflict with the constitutional prerogative or franchise of a citizen to vote if he has resided twelve months in the state and six months in the county.

January 15, 1884.

Ordinary. Fences. Elections. County Matters. Constitutional Law. Before Judge POTTLE. Wilkes Superior Court. November Term, 1883.

Pope, a land owner in Wilkes county, applied for a *mandamus* against the ordinary, alleging, in brief, as follows: On July 9, 1883, an election for "fence," or "no fence" was held in said county; on the next day, the superintendents of election, consisting of a majority from the town district and one from each of the other voting places, met at the court-house, consolidated the vote, and returned the consolidated returns to the ordinary, which consolidated returns showed that "fence" had received 491 votes, and "no fence" 561. The ordinary, acting on these returns, proclaimed by publication that said election had resulted in a majority for "no fence." On July 16, counsel for Pope applied to the ordinary and inquired if he would not examine the returns, decide all questions arising out of the election, and proclaim the true result. The ordinary replied that he considered that the consolidation of votes was for the managers, and declined to recede from his position. It was insisted that the votes of two adjoining districts were rejected by the consolidating board; that thirty votes which were cast for "more and better fences" were rejected; and that a large number of votes for "no fence" were printed with the "no" in small letters in the midst of an engraving, so that it was not easily read, and that about two hundred votes intended to be for "fence" were thus cast against it. The votes of

what were known as the Delhi and Danbury districts were rejected, because the superintendents of elections therein, though residing in the county, did not reside in the districts.

As to the votes of the two adjoining districts rejected, the following material allegations were made : The village of Delhi is situated partly in the 180th and partly in the 181st militia district, a road running through the village dividing them. The court-grounds of both of said districts are in the village. The polls were opened at the court-ground of the 180th district, and the voters from both districts voted at said polls. For a long time preceding the election, Delhi was the voting place of a precinct in said county, which is constituted of said two districts. It was insisted that the entire vote should be counted, or if any were rejected, it should be only the votes of those not residing in the 180th district, the district in which the election was held.

To this application the ordinary demurred, upon the grounds that it appeared therefrom that he had done in the premises all that the law required; that, having acted in the case and announced the result, *mandamus* would not lie to compel him to act again, whether his judgment was right or wrong; that *mandamus* does not lie against him by reason of the matters set forth in said application, and that said application is insufficient in law.

The demurrer was overruled, and the ordinary answered. The only facts stated in the answer necessary to be set out are the following: The statements as to the adjoining districts are true; respondent knows nothing concerning the votes for "more and better fences," or tickets containing the small "no;" no such facts appeared from the consolidated returns, and no such question was made before him. Respondent knows of no ground of illegality as to the Danbury district, except that stated in the application. The consolidated returns were made to him July 10; on July 12, no question having been raised or objection

made, he examined the returns and announced the result. On July 16, counsel for Pope asked respondent if he had examined the returns, to which he replied that he had, and had made up his judgment; but no question was made before him as a judicial officer.

The answer was stricken, on demurrer, and the mandamus ordered to issue, requiring the ordinary to examine the returns, decide the questions made, and declare the result. Respondent excepted.

W. M. & M. P. REESE; SIMS & SHUBRICK; W. H. TOOMBS; F. H. COLLEY; HARDEMAN & IRVIN, for plaintiff in error.

J. C. REED, for defendant.

JACKSON, Chief Justice.

A *mandamus* was issued, by order of the superior court, to the ordinary of the county of Wilkes, commanding him to examine and count the returns of an election in that county on the issue of fence or no fence. To the judgment granting that writ the ordinary excepted, and the sole question is, should the *mandamus* have been issued on the facts disclosed by this record?

1. There was no application in writing of any sort made to the ordinary. There was some conversation as to what he had done and would do, between the counsel of defendant in error and the ordinary touching the returns, but no motion or petition or application of any sort—certainly not a line in writing—invoking action by the ordinary. The Code requires that " all applications for proceedings before the ordinary, sitting for county purposes, shall be by petition in writing, which shall plainly and distinctly set forth the grounds of the proceedings desired." Code, §4123. This is county business, and the ordinary, on the occasion of action on such an election as involves the question of fence or no fence, is engaged in, or, to use the language of the statute, " is sitting " for county purposes of more im-

portance perhaps than any other.    And the section of the Code above cited concludes this case, because there was "no petition in writing," and none which "plainly and distinctly set forth the grounds of the proceedings desired," and, therefore, there was nothing on which the ordinary could legally act, and for refusal so to act, on which any *mandamus* could operate.    Being asked to do nothing, according to the requirements of law, the superior court had no power to make him do something or anything. It may be, if a petition in writing had been framed and the grounds set out therein, and "all objections to the proceedings," also "in writing," as required by the same statute— Code, §4123—had been filed, the ordinary might have granted the petition; at least, until he refused to act upon it, no *mandamus* would lie to make him.    It is his refusal to act which forms the very corner stone of the necessity of the writ of *mandamus*.

2.  But even if the application had been made in writing, it would have been too late after the result was proclaimed.    The act of 1880–81, pp. 60, 61, Code, §1455, enacts explicitly that " the returns of said election shall be made to the ordinary of said county, and after examining the same and deciding upon all questions which may arise out of said election, he shall proclaim the result as aforesaid."    So that the questions must be made before he proclaims the result.    The conversation between the ordinary and the counsel occurred some days after the result was proclaimed ; therefore, even if such conversation could be tortured into a petition in writing, it would have been too late.

3.  It is said, however, that the ordinary proclaimed the result without examining the returns, as the law requires ; that the law requires them to be made to him from each district before consolidation, whereas they had been consolidated before returned to him.    The statute enacts that the election shall be " under the same rules and regulations as provided for members of the general assembly." The act in regard to election for members of the general assembly provides that those who manage the elections,

at least one from each precinct, shall consolidate. Code, §1288, sub-division 8. Therefore the managers for the precincts here—the militia districts—must consolidate the returns and then turn them over to the ordinary, for that officer to hear and determine questions which may arise, according to the act of 1880–81, Code, §1455, and proclaim the result. No points, questions or issues having been made before him, he did right in proclaiming the result as consolidated.

4. But even if the petition had been in writing, and in time, and it had been the duty of the ordinary to receive the separate returns, and to consolidate them, examining each before consolidation, the mandamus should have been denied, under the facts disclosed in this record. The act, Code, §1455, requires that the election shall be held "at the court ground of each militia district." The managers rejected the votes at a precinct where two militia districts gave their votes together. They could not have done otherwise without violating the letter and spirit of the act. The letter is that the court ground of each militia district shall be a precinct for voting, and the reason and spirit of the act is found in the paragraph which declares "that no person shall be allowed to vote at said election except in the militia district in which he resides." The object was to prevent repeating and other illegal voting, and this was defeated the moment unknown persons from other districts were allowed to vote. It matters not that the two districts which voted together adjoined; nor that the precinct was the same spot as one of the court grounds. That fact legalized the vote of residents in that district, but not the others; and neither the application for *mandamus* nor the answer informs us how many voters lived in one or in the other—how many were legal or illegal. To authorize the writ of *mandamus*, it is clear that the applicant for it must show that the result from a new count and examination would be changed; the contrary appears here; if the whole vote at this precinct be thrown

out, or one half only, the result would be the same; and as the applicant does not allege that more than half, or indeed how many, and who lived in the militia district where the precinct was located, and thus does not show legal votes enough to change the result, the court will not do a vain thing—a mere unproductive act—and have a new count for the mere fun of it, or other reason, equally without practical good.

It is hardly necessary to add that the act, in that it restricts the voter to his district, does not conflict with the constitutional prerogative or franchise of the citizen to vote, if he has resided twelve months in the state and six months in the county. This provision of the act of 1880–81 simply declares where, in this election, he shall exercise his constitutional elective franchise.

In any view we can take of the case, the *mandamus* was improperly granted, and the judgment is reversed.

Judgment reversed.