### DRAKE et al. v. DREWRY, ordinary.

Under the provisions of the " local option liquor law," embodied in section 1541 et seq. of the Political Code, the ordinary has the power, and it is his duty, before declaring the result of an election held under that law, to entertain and pass upon a contest respecting such election which may

be presented to him by any qualified voter or voters of the county wherein the same was held, and his jurisdiction extends to a decision of all questions and grounds of contest affecting the validity of the election or its result, thus brought to his attention. It follows, that the superior court has no jurisdiction or authority to prohibit the ordinary from performing the duties thus imposed upon him by the statute.

FISH and LEWIS, JJ., dissenting. The ordinary of a county where an election has been held under the statute known as the "local option liquor law" has no jurisdiction to hear and determine a contest, arising under a petition by one or more voters of the county, which impeaches the validity and fairness of the election by seeking to go behind the returns of various managers of certain precincts in the county, with the view of examining and having a recount of the ballots, for the purpose of throwing out certain votes alleged to have been illegally cast. Under the act in question, the duties and powers imposed upon the ordinary are of a ministerial or political nature, and not judicial. The questions presented by such a petition are of a judicial nature, over which the act itself gives the superior court of the county original and exclusive jurisdiction.

Argued November 6, — Decided December 6, 1899.

Petition for prohibition, etc. Before Judge Reagan. Spalding county. October 24, 1899.

*J. S. Boynton, W. C. Beeks, Lloyd Cleveland, F. D. Dismuke,* and *Searcy & Boyd,* for plaintiffs. *R. T. Daniel, M. W. Beck, T. E. Patterson,* and *J. J. Flynt,* for defendant.

LITTLE, J. Drake and others presented to the judge of the superior court of the Flint circuit a petition setting out the following facts: Petitioners are citizens, taxpayers, and registered voters of Spalding county. On the 19th day of October, 1899, an election was held in said county under the local option law. At the election a majority of the votes was cast in favor of the sale, and the managers of the election made returns to the ordinary, and it was the duty of that officer to immediately consolidate the vote and declare the result of the election. Certain persons (naming them) have filed with said ordinary a paper claiming to be a contest of the election, in which are set out various grounds, and a prayer that the ordinary hear the grounds of the contest therein made. The ordinary, on receiving such paper setting out the grounds of the contest, refused to consolidate the return and declare the result. The ordinary also refused the motion of petitioners to dismiss the contest, but held and decided that he had juris-

diction to judicially hear evidence and pass upon all the grounds of the contest. The petitioners allege that the ordinary has no legal authority or jurisdiction to hear evidence touching such contest, nor to pass any order or judgment thereon; that such pretended contest does not contain the names of one tenth of the voters voting at the election; and that it is not in form or substance such a contest as would authorize the ordinary or any other court to hear the same. Thereupon the petitioners prayed that the writ of prohibition should issue, directed to said Drewry, ordinary, prohibiting him from hearing and passing upon said contest, and that he be prohibited from opening the ballot-boxes and counting the votes therein, etc. After considering the petition, the judge of the superior court refused to grant the writ of prohibition, and to such refusal the plaintiffs excepted.

The only question raised for our determination is, whether under the provisions of sections 1541 et seq. of the Political Code, which embody the local option law, the ordinary of a county has jurisdiction to hear and determine questions affecting the fairness and legality of such an election, on a contest made before him. This court has found it necessary on more than one occasion to consider the question here made, without having determined the same; and in the case of *McMillan* v. *Bell*, 105 *Ga.* 496, it took occasion to say that some of the provisions of the code in relation to such contests were involved in so much obscurity and uncertainty that it is difficult, if not impossible, to ascertain their true intent and meaning, and it was suggested that such provisions needed legislative revision. Without any legislative action in this direction, we are now called upon to construe and, if possible, harmonize those sections of this law which in the consideration of that case we found to be apparently so inharmonious. In doing so we call to our aid certain rules for the construction of statutes, which have been laid down for ascertaining the proper meaning to be given to their various provisions.

Citing 38 N. J. Law, 64; 9 Cow. 437, Mr. Sutherland in his work on Statutory Construction, § 325, says: "Every part of a statute must be viewed in connection with the whole, so as

to make all its parts harmonize, if practicable, and give a sensible and intelligent effect to each. It is not presumed that the legislature intended any part of a statute to be without meaning." It is also a well-recognized rule to be adopted in the construction of statutes, that general words should receive a general construction, unless there is something in the statute to restrain them. In the case of *State* v. *Atkins*, 35 *Ga.* 319, it was said that, "in order to arrive at the intention of the law-giver, the whole and every part of the statute should be considered in determining the meaning of any of its parts; taking the words to be understood in that sense in which they are generally used by those for whom the law was intended, and discarding all subtle and strained construction for the purpose of limiting or extending their operation or import." It is provided by section 1545 of the Political Code, and as a part of the local option law, that " All managers of elections held as by this Article provided shall  .  .  deliver one list of the voters, .  .  ballots, and tally-sheets to the ordinary, who shall carefully consolidate the returns, and decide all questions and contests arising under elections held by virtue of this Article." It is further provided by section 1546 of the same code that, " Within twenty days from the day on which the ordinary declares the result, one-tenth of the number of voters having voted at such election may petition the superior court, setting out plainly and distinctly the cause of contest, when, if the cause set out is such as impeaches the fairness of the election, or the conduct of the ordinary, the judge shall grant an order directed to three justices of the peace of the county, requiring them to recount the ballots on a given day, and report the result to the next term of the superior court of that county, or the term of the court to which the petition may be returnable, at which term the case shall be heard." It is further provided in this section that, "If the election shall appear to have been fraudulently conducted, or the votes fraudulently counted, the judge shall have power to declare the result and overrule the action of the ordinary in the premises." It seems, from a literal reading of these two sections, that as a matter of law two contests of an election held under the local option law are pro-

vided.　But it is urged in behalf of the plaintiffs in error, that the words in section 1545, which authorize the ordinary to decide all questions and contests, only vest in that officer authority to hear such questions and contests as under the general laws of the State are vested in the managers of elections; and we are cited to section 72 of the Political Code, as prescribing those questions and contests.　Attention, however, is called to the fact, that the section cited refers to the elections of officers for the administration of the government, and provisions for contesting the election of any one of the persons declared to be elected are expressly made, by statute, essentially different from the provisions in the case of elections under the local option laws.　In the cases contemplated by that section, the managers consolidate the returns, and contests which involve the fairness of the election, or which seek to reject illegal votes, are by the statute provided to be made after the vote has been consolidated and the result announced.　There is, under section 72, but one provision which may be regarded as a question which the managers of elections may decide.　After providing that the election shall be held by ballot, and the method of receiving the ballots, and providing for challenges, and giving the managers power to preserve order, and prescribing the method of the returns and the consolidation of the votes, it is provided that: "If any voter shall vote who has not paid his taxes, and been registered, his vote shall be illegal, and the commissioners who consolidate their returns of the election shall not count such votes in making out the returns."

In cases of elections under the local option laws, the words used in the code make it imperative that the ordinary *shall* decide all questions and contests.　These are very much broader in signification than those which direct the commissioners to reject from the returns the ballot of an illegal voter.　Fairly interpreted, they imply that the ordinary shall not only reject illegal votes, but shall make an investigation in the nature of a judicial proceeding on the merits of such questions, affecting the final result, as may be brought before him.　It will also be found that, by the provisions of section 72, the managers or superintendents shall not examine the ballots, but shall de-

liver them carefully sealed to the clerk of the superior court, that the latter officer shall retain the same until after the next term of the superior court, when, if a *contest* is not begun, the ballots shall be destroyed, etc.; evidently showing that it was not intended, by the terms of the section which gives the commissioners the right to reject from the returns an illegal vote, or contemplated, that those officers should have any power in relation to a contest; while the provision which we are considering, in terms, makes it the duty of the ordinary, after the ballots, tally-sheets, and list of voters have been returned to him, to decide all contests, that is to say, where the result of the election for any supposed legal cause, either of law or fact, comes into dispute—is called in question, the ordinary shall decide the questions thus raised, and the duty to decide must carry with it the antecedent duty of hearing. It is further contended that no contest can be instituted except after the result has been declared. This position, however, can not be tenable. It must be borne in mind that this is a special election to determine simply whether a regulation forbidding the sale of spirituous liquors shall be enforced within a given county, thus differing essentially from an election of State or county officers. It is made the duty of the ordinary to declare the result, and he by the words of the act is directed to hear all questions and contests. Necessarily the result referred to is the true result. After having declared the result, no power is given to him to set it aside. On the contrary, the result as declared must stand, unless set aside in a manner which we will presently consider. It must then be true that, with the power of deciding questions and contests given, and it being made his duty to declare the result, the questions and contests must be determined antecedently to the declaration of the vote or result of the election. See *Dyson* v. *Pope*, 71 *Ga.* 209. The main contention upon which the case of the plaintiffs in error must rest, if there is any merit in it, is, that the jurisdiction to entertain a contest of an election under the local option law rests, by the statute, in the superior court and not in the ordinary; and in furtherance of that view it is claimed that if it be held that the ordinary has jurisdiction to entertain a con-

test, then provision is made for two contests of the same elec-
tion. It is further urged, notwithstanding the language used
in section 1545 of the Political Code, conferring the power on
the ordinary to decide questions and contests, that necessarily
the jurisdiction of that officer is limited to ministerial acts, be-
cause full provision for the contest is made, in the subsequent
section, by petition to the superior court. When we look to
the terms of the act, however, as embodied in the statutes, we
find it not only plainly written, that the ordinary shall decide
all questions and contests concerning the election, and that it
is his duty to declare the result, but the statute prescribes that
if the result of the election thus declared is against the sale,
the ordinary shall publish the same in the newspaper in which
notice of the election was given, and the provisions of the act
shall take effect as soon as the publication directed has been
made. Hence it would seem logically to follow, that whatever
questions and contests the ordinary is empowered to hear must
be heard and determined anterior to a declaration and publi-
cation of the result. It is hardly reasonable to insist that the
act should take effect as soon as the publication of the result
has been made, and that no license to sell liquors shall be
granted after such publication, when in fact the result is in
doubt and dependent upon the questions and contests to be de-
cided after such publication. Again, the provision of the next
section of the code is, that within twenty days from the day on
which the ordinary declares the result, one tenth of the num-
ber of voters having voted at the election may petition the
superior court on grounds which impeach the fairness of the
election or the *conduct* of the ordinary. What conduct? Surely
not that of a ministerial officer whose duty it is to simply ag-
gregate the number of votes as returned by the managers of
the election. When the statute, in this connection, gives to the
superior court a right to review the conduct of the ordinary,
such language necessarily implies a review of the action of that
officer, and it necessarily follows from the context that the con-
duct to be reviewed relates to his decision on such questions
and contests as may have arisen before him.

Again, it is directed by the act that the superior court may

review such conduct, and in doing so may require a recount of the ballots by three judicial officers of the county; evidently implying that any count of the ballots which may have been made by the ordinary in his decision of the questions and contests made before him shall, on a proper case made, not be accepted as final, but that the superior court, in order to determine the truth as to the vote, may have the ballots *recounted.* Now, it will not do to say that such recount refers to the consolidation of the votes cast at the various precincts, for a consolidation of the votes does not involve a count of the ballots —a contest may do so,—and, as has been seen, by the provisions of the act the ordinary shall not only carefully consolidate the returns made to him, but shall also decide questions and contests. Further than this, it is provided that the ordinary shall have ten days notice of the filing of the petition. If this is a mere contest as to the result of the election which has been held, why is the ordinary to be given notice of the filing of the petition? As a judicial officer, it is to be presumed that he stands impartial, and it seems to us that the only reason for giving to that officer notice of the filing of the petition is, that he may have an opportunity of defending his action in deciding the questions and contests which were made before him, and defending himself against charges of fraud and corruption in a case where his action is directly in issue, as well as to furnish the court the reasons for his action; for the last paragraph of the section declares that if the election appears to have been fraudulently conducted, or the votes fraudulently counted, the judge of the superior court shall have power to declare the result and overrule the action of the ordinary in the premises. It would seem, in view of the words of the act fixing the duties of the ordinary, taken in connection with the declaration that if on investigation had in the superior court it appears that the votes were fraudulently counted the judge shall have power to overrule the action of the ordinary, that necessarily the fraudulent count of the votes in the first instance refers directly to the action of the ordinary. Now, if this reasoning be correct, then both of these provisions of the code can stand in entire harmony, that is to say, that when in the first instance

the ordinary comes to consolidate the returns, he shall decide all questions and contests made before him at that time, that, having done so, he shall declare the result, make publication of the same, and immediately thereon the act takes effect, and no license for the sale of liquors shall thereafter be granted; but, notwithstanding his publication and putting in force the prohibitions named in the act, if within twenty days as many as one tenth of the voters allege causes which impeach the fairness of the election or the conduct of the ordinary in his determination as to the result of the election, the fairness of such election and the conduct of the ordinary in the first instance may be reviewed, and as a result of such a review, if the election has been fraudulently conducted, or the ordinary has unfairly acted, a power is given to the judge to overrule such action of the ordinary and to declare the proper result. This seems to be the scope of the act, and expresses the intention of the lawmaking power. It is a well-settled rule that in ascertaining the purpose and intention of the legislature in the enactment of a law, if such intention is not clearly expressed in the statute, the court will take notice of the history of the terms of the statute when it was enacted. 3 How. 9; 91 U. S. 72. As said by Mr. Sutherland in his work on the Construction of Statutes, 383 : "It is needful in the construction of all instruments to read them in view of all the surrounding facts. To understand their purport and intended application, one should, as far as possible, be placed in a situation to see the subject from the maker's standpoint and study his language with that outlook. Statutes are no exception." Citing 108 U. S. 526; 94 Pa. St. 450; 4 N. Y. 140.

It appears from the journals of the General Assembly of Georgia, at a session held in July, 1885, when the act from which the sections of the code which we have been considering were codified was passed, that the original act was introduced and passed in the Senate; that it passed the House by a substitute, and went to the Senate for consideration by that body; that when the 4th section of the substitute was reached, it did not contain the provisions which authorized a review by the superior court, but did contain the direction to the ordi-

nary to hear and determine contests, and that an amendment was offered to that section in the Senate, providing for this review of the fairness of the election and the conduct of the ordinary by the superior court. The original amendment to this section provided that such review might be had on the petition of any qualified voter. This amendment was itself amended by striking out the words "any qualified voter" and inserting in the place thereof the words, "one-tenth of the number of voters having voted at such election." Senate Journal, 1885, p. 41. This amendment to the amendment was agreed to, and the substitute of the House, as amended, was passed by the Senate. Senate Journal, 1885, p. 109. So that it appears. that when the substitute for the original Senate bill was passed by the House and came up in the Senate, it did not provide for a review of the fairness of the election and the conduct of the ordinary by the superior court, but that section 4 only provided, in relation to contests, that the ordinary should decide all questions and contests arising under the election ; that the Senate amended this section, not by striking out or changing the powers given to the ordinary, but by simply adding thereto a provision which authorized the superior court, on the petition of one tenth of the voters, to investigate the fairness of the election and the conduct of the ordinary; and the amendment thus offered and adopted is the provision which we now find in our code, without change. No proposition was made to curtail, qualify, or explain that portion of the 4th section which made it the duty of the ordinary to hear contests, but to this was simply added this provision for a review. If, therefore, we can arrive at the intention of the lawmakers by reading this law in view of the surrounding facts, we are constrained to rule that the powers given to the ordinary must be construed to be entirely independent of the power of the superior court to entertain jurisdiction and review the fairness of the election. When properly construed, the conflict between the two sections is more imaginary than real, and the true construction of the act in relation to contests must be, that the ordinary is given jurisdiction, when he goes to consolidate the vote, to hear all questions and to determine all contests which may

be.made before him concerning the fairness and legality of the
election; that notwithstanding his determination, and without
regard to the published result, if subsequently a considerable
number of those who voted in the election, not less than one
tenth, should in a petition to the superior court assign causes,
whether made before the ordinary in the first instance or not,
why the election was not fairly conducted, or why the ordinary
had improperly acted and proclaimed the wrong result, the
superior court might take up these questions, in the interest
of fairness and justice, and on proper evidence might overrule
the action of the ordinary, and declare a different result; and
further, that the superior court has this jurisdiction even when
no contest is made before the ordinary, or, if made, then on
the same grounds as there urged, or different ones.    Thus in-
terpreting these provisions of our code, it must be held that
the ordinary of Spalding county has jurisdiction to determine
the contest made before him, and, having such jurisdiction,
the judge of the superior court committed no error in refusing
to grant the writ of prohibition.

*Judgment affirmed.    All the Justices concurring, except Fish
and Lewis, JJ.*

LEWIS, J., dissenting.   It appears from the record in this
case that a petition was brought by nineteen persons, claiming
to be residents and legal voters of Spalding county, before the
ordinary, for the purpose of contesting an election held in that
county under the "local option liquor law."    One ground for
this contest was an allegation made only in general terms, that
the result declared by the managers of the Griffin precinct was
not a fair and just count; and there was a prayer for a recount
of the ballots in that box.    The other grounds in the petition
alleged that in various other precincts in the county illegal
votes were cast; and the purpose of the petition was to go be-
hind the returns of the managers of these precincts, with the
view of instituting an examination into the ballots that were
cast, for the purpose of throwing out a number of voters alleged
to be illegal for various reasons.    The purpose, therefore, of
this petition was to have the ordinary, as a judicial tribunal,
hear and determine a contested-election case involving issues

which for their proper determination and investigation necessarily involved going behind the returns of the election managers, an examination of the ballots cast, and the hearing of testimony upon the various issues touching the qualifications of a number of voters who had participated in the election. It is claimed that the ordinary has authority to entertain, hear, and determine such a contest, by virtue of the provisions of section 1545 of the Political Code. By this section it is made the duty of the managers of the election "to deliver one list of the voters and tally-sheets to the clerk of the superior court, to be filed in his office, and one list of the voters, ballots, and tally-sheets to the ordinary, who shall carefully consolidate the returns, and decide all questions and contests arising under elections held by virtue of this Article." This is the only language in the entire act that gives the ordinary any power whatever to decide questions and contests arising under such an election. There is nothing in the act which expressly or by implication prescribes any procedure by which such a contest shall be heard and determined by the ordinary. It nowhere specifies who may file a petition for such a contest, what number of voters have a right to present to him such a judicial question, and, after presented, what notice, by service, publication, or otherwise, should be given of the proceeding; and if an effort be made to go into the ballot-box for the purpose of attacking and throwing out certain votes as illegal, no means is prescribed for the accomplishment of such an end. It does not even give the power to subpœna witnesses or to take depositions, and no provision whatever is made for the payment of costs of officers of court, however the contest may terminate. It would certainly be an anomaly in law to endeavor to enforce a statute giving in such general terms power to an official to decide questions and contests relating to a public election, and not prescribing any method whatever by which such contests shall be instituted, how issue may be joined thereon, and how or when the questions involved shall be heard and determined. In all the laws of this State, of which I am aware, upon the subject of contested elections involving regular judicial proceedings in court, the means of making, investigating, and de-

termining such a contest are prescribed by the statute. For instance, sections 107 to 109 inclusive of the Political Code, relating to contests over the election of any person requiring a commission from the Governor, prescribe minutely and particularly the form and manner of instituting such a contest, notice that shall be given, how, when, and before whom the case shall be tried, how testimony shall be taken, and particularly what proceedings shall be instituted when the election is contested on the ground of illegal votes. Section 111 of the Political Code adopts these regulations, and makes them applicable to contests arising over the election of the various officers therein mentioned.

Even, then, if it had been the intention of the legislature to confer upon the ordinary the power to judicially hear and determine a contested-election case, especially of the character presented by this record, the act has left that official powerless to accomplish its purpose, in that it does not provide him with the means, or in any manner indicate by what procedure his work may be accomplished. It will be noted that in public elections ordinarily the managers of the various precincts in the county, or a certain number from each precinct, assemble at the county-site for the purpose of consolidating the vote. These managers necessarily at times have questions arising before them, touching the returns, and relating to a consolidation of the votes. In the local option act in question it will be observed that the general rule of elections touching the conduct and duties of managers who meet to consolidate the vote of a county does not prevail; for, under section 1545 of the Political Code, it is made their duty to deliver the returns to the ordinary, and made his duty to consolidate such returns. Manifestly, then, as to this duty, the ordinary occupies very much the position that managers would occupy generally under other elections in Georgia; and the fact that the section cited confers the power upon the ordinary to "decide all questions and contests arising" can not imply that he can enter into a regular judicial contest, when the law nowhere makes any provision as to how he shall conduct such a contest. Therefore, the "questions and contests" mentioned in the act must

refer to such questions as may arise touching the consolidation of the returns, and which have to be decided before the result can be declared. This by no means makes the provisions of the act as to the ordinary's powers meaningless. Many questions may arise which a board of managers, even in ordinary elections held in the State, would necessarily be called upon to determine before completing the consolidation. For instance, the returns of certain managers might show upon their face that an election was not held at any precinct at all, but that the votes were cast at an improper place, not recognized by law; or they may show upon their face that an election at a precinct was held at an improper time not authorized by law. Manifestly, it would be the duty of the managers to discard such returns. Accordingly, it was held in *Walker* v. *Sanford*, 78 *Ga.* 165, the ordinary acted properly in refusing to count the vote of a precinct where one of its managers was disqualified. Other instances might be cited where mere ministerial officers, in order to consolidate and declare a result, would have to determine questions; but it by no means follows that in any event, without special grant of legislative authority, can such officials constitute themselves into a judicial tribunal for the purpose of entering into an investigation of a contested-election case. Even, then, if we construe the provisions of the act, embodied in section 1545 of the Political Code, without any reference whatever to other portions of the act relating to contests over such elections, I do not think the ordinary could assume the power of hearing and determining the contest he has undertaken in this case. If the legislature in this instance intended to create a new court for the purpose of hearing such contests, it abandoned its wish before the job was completed, and left it an incomplete judicial structure unsupplied with such machinery as is essential to its active operation.

If that provision of the statute touching the powers of the ordinary stood alone and unmodified or unexplained by any other provision in the act, he would have been left practically with the same powers delegated to that officer in the act regulating elections for no fences. The latter part of section 177 of the Political Code provides that "The returns of said election [that

is, election on the fence law] shall be made to the ordinary of said county, who, after examining the same and deciding upon all questions which may arise out of said election, shall proclaim the result by notice as aforesaid." The act further provides that if a *lawful majority* is for " no fence," then the provisions of the law shall go into effect. It is true the word "contest" is not used in that act, but words are used equally as broad and as comprehensive, giving power to the ordinary to decide upon all questions which may arise out of the election; and besides it seems to contemplate that it is the " *lawful*" *majority* the ordinary must ascertain ; and perhaps with more force may it be implied, under the terms of this act, that one has a right to contest the election before the ordinary, if such a contest be necessary to show the *lawful* majority. I infer from the learned argument of Mr. Justice Little, in support of the views of the majority of this court, that it is concluded that the ordinary, under the act in question, is constituted a judicial tribunal, and, as a court, has the power to determine a contested-election case under this local option law. As to the fence law, this court is committed to a contrary proposition in regard to the powers and duties conferred upon the ordinary by virtue of the provisions of that act. In *Seymour* v. *Almond*, 75 *Ga.* 112, it is decided : " The ordinary, in respect to an election to decide the question of fence or no fence, is not a court, but an officer of the body politic of the State, to whom is confided the ordering, supervision, and announcemen tof the result of an election on that issue." It is further decided : "If he acted in these matters as a court, the writ of prohibition would issue only to stop him from acting as such, if the subject-matter was beyond his jurisdiction." But this particular question, so far as concerns powers of an ordinary under the fence law, was directly decided by this court in *Harris* v. *Perryman*, 103 *Ga.* 816. It was there held that the language which we have above quoted from the fence law " does not authorize or provide for any contest before the ordinary as to the result of such an election." It appears from the facts in that case that application was made to the ordinary for the purpose of contesting an election that was held on the question of fence or no

fence. The ordinary refused to entertain the contest. A petition for mandamus was filed by the contestants, in the superior court, for the purpose of compelling the ordinary to entertain and pass upon the contest presented in the form of a petition by citizens and taxpayers. The mandamus was refused, and this judgment was affirmed by this court; the ground of its affirmance being based upon the principle above noted, that the act itself did not authorize or provide for any such contest. The reason for the decision is fully and clearly set forth by Mr. Justice Fish in his opinion on page 818, in the following language: "If the legislature intended by this language to confer upon any one the right to contest an election of this kind and to make it the duty of the ordinary to hear and decide such a contest, it seems very strange, indeed, that none of the usual provisions in reference to contested elections are found in the section of the code relating to these elections. How an issue shall be formed, who shall be necessary parties to it, what notice of the contest shall be given, upon whom and how long prior to the hearing it shall be served, before whom evidence shall be taken, the authority to examine suspected ballots, etc., are all questions upon which the law applicable to these elections is absolutely silent."

In this connection attention is called to the case of Echols *v.* State, 56 Ala. 136, cited in the opinion of Mr. Justice Fish. By reference to the facts reported in that case it will be seen that, under the charter for the city of Opelika, the city council were authorized to examine and count the votes; made judges of the election, with full power to determine all matters in relation thereto, ascertain the legality of voters, reject illegal votes, take testimony, examine witnesses, send for persons and papers, and decide who were legally elected mayor and aldermen of the city. Certainly this provision in the Alabama statute is a much more comprehensive one, and enters more minutely into detail, with reference to passing upon all issues that might grow out of a contest over an election, than is embodied in the local-option liquor law of this State, in so far as concerns the powers it confers on the ordinary. Yet it was decided by the Supreme Court of Alabama, that there was "nothing in the

statute which gave to this proceeding the form, solemnity, or sanction of a contested election, no provision for instituting any such investigation by any dissatisfied elector, and nothing said about notice, or issue to be formed." This is the reason assigned by the court for its conclusion. It was, therefore, held that the provision in the statute referred to " the primary count and reckoning of the ballots." The same principle, that no such judicial power has been conferred on the ordinary, has in effect by this court been applied to the local-option liquor law in *Scoville* v. *Calhoun*, 76 *Ga.* 263. That was also a petition for a mandamus to the superior court, made with the view of preventing the ordinary from declaring the result of an election held under the local option act of 1885, until he had passed upon a petition, which the plaintiffs had presented to him, contesting the election. It was held that the court properly refused to grant the mandamus; and the reason for the decision was, that the election and the supervision thereof by the ordinary was the exercise of political and police powers incidental to legislative and executive government, and not, in their general political and police effect, at all judicial. It was therefore decided that it was proper to refuse a mandamus on the application of a few persons, less than one tenth of the voters, to compel the ordinary of a county, where an election had been held, to receive and hear a contest made and offered to be filed with him touching the election. If the local option act of 1885 were intended to create the ordinary a court, or to give him power, as a judicial tribunal, to decide such a contest; and if, according to the opinion of the majority of the court in this case, it would be not only his right but his duty to hear and determine such a contest, a mandamus would certainly lie to compel a hearing and disposition of the case in the event the ordinary refused to entertain a petition for such a contest.

The above views are based upon what I think would be a proper construction of section 1545, even if it stood alone in the act, so far as providing for a decision of questions and contests arising under the election. But when considered in the light of the section that follows, the conclusion reached is, if possible, the more irresistible. Section 1546 expressly provides for

a contest of this nature in the superior court of the county where the election was held.   It prescribes when such contest may be made; how and by whom it shall be made, to wit, by petition of one tenth of the voters who voted at the election, and within twenty days from the time the ordinary declares the result; what the petition shall contain; what direction the judge shall give the case; the means by which testimony can be taken, or the ballots recounted by three justices of the peace under an order of court; and when the case shall be heard and determined.   In short, it goes into minute details as to what procedure shall be adopted in order to bring about a hearing and determination of such a contest.   This section makes it a judicial question, and specifies the particular court that shall have jurisdiction over the contest.   If a literal, broad and comprehensive meaning is given the language employed in section 1545, as has been placed thereon by the majority of my brethren, then we have the anomalous and perhaps unparalleled feature in a law touching a particular public election, wherein two judicial tribunals are created and clothed with the jurisdiction of hearing a contest over the election.   In the one case the ordinary, whose jurisdiction is limited in law, can hear such a contest upon the petition even of *one voter,* and can, at his own option or discretion, if he can do so at all, prescribe the manner of procedure, fix the time and place of hearing, and what notice shall be given.   In the other case, power is given to a court of general jurisdiction, prescribing who and what number shall have a right to make the contest by petition, and the steps that shall be taken throughout the prosecution of the case.   There is nothing in the section giving jurisdiction to the superior court which in the least indicates that it is only of an appellate nature.   It is virtually conceded, however, by the argument of the majority of the court that the superior court's jurisdiction is not of an appellate nature; that questions of contest may be made before it that were never heard or passed upon by the ordinary; that both, so to speak, are courts of original jurisdiction.   In other words, that the ordinary may decide the result of the election on one ground of contest made before him, and the superior court may reach an opposite conclusion on a con-

test made before it on an entirely different issue.　Another difficulty about forcing such a construction of section 1545 is, that any number of contests might be instituted before the ordinary declares the result, and, pending one contest, another may file a petition before him, contesting the validity of the election on entirely different grounds; whereas the act with reference to the jurisdiction of the superior court manifestly provides for but one contest, which must be instituted by at least one tenth of the number of voters who voted at the election.　It is worthy of note in this connection that the general law upon the subject of ballots guards with sacred vigilance the sanctity of the ballot-box, and never sanctions or authorizes any examination or tampering with ballots unless expressly authorized by statute. This contest necessarily involves an investigation into the ballot-box, an examination of ballots, and a recount of votes.　The only provision in this act that authorizes such an investigation is that given in section 2546, to three justices of the peace, under an order granted by the judge of the superior court, requiring them to recount the ballots on a given day, and report the result to the next term of court, or to the term to which the petition for contest is made returnable.　How, then, can it be implied from this act, or any other law upon the subject, that the ordinary has such a power, when it is specifically given to an entirely different tribunal?

Our attention is called to the fact that the contest before the superior court relates to impeaching the fairness of the election, or the *conduct* of the ordinary.　But the same power is granted to the superior court by the same section with reference not only to the conduct of the ordinary, but also with reference to the *conduct of the managers of the election;* and therefore there is no reason for inferring that the judge, in reviewing the conduct of the ordinary, is any more considering the act of a judicial officer, or a court, than he is when he reviews the conduct of the managers of the various precincts in the county. It is further insisted by Mr. Justice Little, in his opinion, that as the act requires a recount of the ballots by three judicial officers of the county, it evidently implies that any count of the ballots which may have been made by the ordinary in his

27

decision of the questions and contest made before him shall not be accepted as final, but that the superior court, to determine the truth of the vote, may have the ballots recounted; and it is contended that as such a recount can not refer to a consolidation of the votes cast at the precincts, it must refer to a count of these votes that has been made by the ordinary under a contest. I think, on the contrary, that the *recount* there clearly has reference to the count that has been made of the votes by the *managers of the various precincts;* for whatever count of the ballots cast at any one or more of the precincts is made after the managers have acted is necessarily a recount of the vote cast at the precincts in question.

I can see nothing in the action taken by the General Assembly in reference to the passage of this act which is at all in conflict with the views herein expressed. Upon examining the journal referred to by Mr. Justice Little in his opinion, I discover that the act originated in the Senate. When it reached the House, a substitute was proposed by that branch of the legislature, which omitted the provision with reference to conferring jurisdiction on the superior court to hear and determine contests over the election. When this substitute was returned to the Senate, it seems that body insisted upon giving that court jurisdiction over such questions, and hence amended the bill from the House by embodying therein the provisions of section 1546 of the Political Code, and the act became a law in its present shape. I infer from this simply that the original purpose of the House was to make the action of the ordinary in declaring the result of the election final, and not open to review by any court, just as has been decided by this court as to his powers in fence elections. The Senate, however, was not willing that such should be the status of law as to the liquor question, and therefore its amendment made all contests of the character presented to the ordinary in this case judicial in their nature, and specifically provided how such contests should be made, heard, and determined by the superior court. As before indicated, even without such special provision in the act in reference to the superior court, I think the powers conferred upon the ordinary were not at all judicial in their nature, and

did not confer upon him jurisdiction to hear such a contest as was presented to him by the petition in this case. But this conclusion becomes more irresistible when we construe together the entire provisions of the act relating not only to the powers conferred upon an officer who acts merely in a ministerial or political, and not a judicial capacity, but also to powers conferred upon a court by virtue of which specific provisions are made for the hearing and determination of a judicial question. I recognize, therefore, the doctrine that "every part of a statute must be viewed in connection with the whole, so as to make its parts harmonize, if practicable, and give a sensible and intelligent effect to each;" but the only way of which I can conceive to harmonize the provisions of this law, and give an intelligent effect to the same, is to give the act the construction herein indicated. For the above reasons, I feel constrained to dissent from the decision of the majority of my brethren.

FISH, J. I concur in the dissenting opinion of Mr. Justice Lewis.