## DRAKE *et al. v.* DREWRY, ordinary.

1. The only notice to which an ordinary is entitled with respect to a contest instituted under section 1546 of the Political Code is a notice "of the filing of the petition" thereby authorized, and this notice must be given to him ten days before the term at which the hearing upon the petition is had.

2. It is not essential to the validity of a contest so instituted that the petitioners should either allege or prove that the "conduct of the ordinary" thus brought under review was morally corrupt or fraudulent.

3. A ballot cast at a given election by one whose name appeared upon the "voters book" should not be rejected from the count because the voter was not, at the time of signing his name in that book, entitled to do so, if prior to the elec-

tion he removed his disqualification and lawfully procured the registrars to place his name upon the list of "registered voters."

Argued November 7, — Decided November 28, 1900.

Contest of election.    Before Judge Reagan.    Spalding superior court.    August term, 1900.

*J. S. Boynton, Lloyd Cleveland, R. L. Berner, F. D. Dismuke, W. C. Beeks,* and *Searcy & Boyd,* for plaintiffs.    *R. T. Daniel, M. W. Beck, T. E. Patterson,* and *J. J. Flynt,* for defendant.

LUMPKIN, P. J.    An election under the "local option liquor law" was held in Spalding county on the 19th day of October, 1899.    Before the result was declared by the ordinary, certain citizens of the county instituted before him a contest.    Thereupon Drake and others sought to prohibit him from entertaining the same.    The case thus arising came to this court, and it was therein decided that: "Under the provisions of the 'local option liquor law,' embodied in section 1541 et seq. of the Political Code, the ordinary has the power, and it is his duty, before declaring the result of an election held under that law, to entertain and pass upon a contest respecting such election which may be presented to him by any qualified voter or voters of the county wherein the same was held, and his jurisdiction extends to a decision of all questions and grounds of contest affecting the validity of the election or its result, thus brought to his attention.    It follows that the superior court has no jurisdiction or authority to prohibit the ordinary from performing the duties thus imposed upon him by the statute." *Drake* v. *Drewry,* 109 *Ga.* 399.    Afterwards the contest was heard by the ordinary, and he declared that the election resulted "against the sale."    A petition for the purpose of impeaching his conduct and having the result of the election declared by the superior court was then filed in that court by Drake and many others, who alleged that they "constituted one tenth of the number of voters having voted at said election."    The judge granted an order for a recount of the ballots, but, at the appearance term of the case, sustained a motion to revoke the same, and dismissed the petition on demurrer.    A bill of exceptions was sued out by the petitioners, and the material questions thereby presented for our decision are those indicated by the headnotes.

1. The main ground of the motion to revoke the order for a

recount of the ballots was, that "said order was granted without J. A. Drewry having been given notice of the time and place of hearing, as in the statute provided." The petition was filed on the 15th day of January, 1900. On the same day the ordinary was served, not only with a written notice of the fact of filing, but also with a copy of the petition itself. The term of the superior court to which the case was made returnable, and at which it came on for a hearing, was the August term, 1900. No further notice to the ordinary was necessary. Section 1546 of the Political Code declares that, upon the filing of a petition of this kind, "the judge shall grant an order, directed to three justices of the peace of the county, requiring them to recount the ballots on a given day and report the result to the next term of the superior court of that county, or the term of the court to which the petition may be returnable, at which term the case shall be heard, provided ten days notice has been given the ordinary of the filing of the petition." It will thus be seen that the requirement of the statute with respect to notifying the ordinary is to the effect that he must be informed "of the filing of the petition" at least ten days before the term of the superior court at which the hearing of the case is had. When this has been done, he has, to all intents and purposes, received due and legal notice "of the time and place of hearing." Manifestly, there was in the present instance full compliance with the law, for the ordinary was served with the requisite notice more than ten days in advance of the term at which the case was to be heard and at which it was heard to the extent hereinbefore indicated.

2. One ground of the demurrer was, in substance, that the petition failed to allege any facts showing that the ordinary had been personally corrupt or guilty of actual moral fraud in declaring the result of the election. This was not essential. It was enough to aver that he had made erroneous rulings and as a result reached an unlawful and wrongful conclusion; and this was done distinctly and with ample sufficiency of detail. It would be strange legislation indeed which required a successful attack upon the integrity and character of a judge, or other official, in order to set aside an erroneous judgment or decision which he had rendered. All judges make mistakes, but very few of them do so wilfully and intentionally. The question whether a particular ruling should stand or fall

ought to depend entirely upon its correctness or want thereof, and this we understand to be the true intent and meaning of the law now under consideration.

3. We come now to the principal question raised by the demurrer, and the one upon which the case, as now presented, really turns. In order to be entitled to register as a voter, every person desiring so to do must take a prescribed oath, by which he is required to depose, in effect, that he possesses, or will by a designated day in the future possess, all the legal qualifications of a voter. This oath is set out in the "voters book." Political Code, § 36. If willing to take it, the applicant signs his name in the book, and he is then registered. Id. § 41. The law provides for a board of "county registrars." Id. § 50. It also makes it the duty of tax-collectors to file with the registrars lists of the names signed in the voters book (Id. § 47), and of the tax-collectors, ordinaries, and clerks of the superior courts to file with the registrars lists of tax defaulters and others disqualified from voting. Id. § 48. The registrars are required to examine the lists of names taken from the voters books and the lists of "disqualified persons," and make up alphabetical lists of " registered voters." Id. § 53. Copies of these last-named lists are to be furnished to the election managers, and only those whose names appear thereon are to be allowed to vote. Id. §§ 59, 60.

The foregoing brief summary of some of the provisions of the registration law will suffice to render clear the application to our present question of certain other provisions of that law appearing in sections 54, 55, and 56 of the Political Code. We quote the first of these three sections entire. It reads as follows: " All names appearing on the lists taken from the voters books, and not appearing on the list of disqualified voters, shall be · entered on the list of 'registered voters,' unless withheld therefrom as hereinafter provided. No name appearing on the list of disqualified voters shall be entered on the list of registered voters, unless placed thereon as hereinafter provided. A name appearing on the list taken from the voters books, and not appearing on the list of disqualified voters aforesaid, shall be withheld from the list of registered voters when the county registrars are convinced by sufficient legal proof that such person is, in fact, not qualified to vote. A name appearing on the list of disqualified voters shall be entered on the list of

registered voters when said name appears on the list taken from the voters books, and when, in addition thereto, the county registrars are convinced, by sufficient legal proof, that such person was not disqualified, or that his disqualification has been removed. No name shall be entered on the list of registered voters unless it was signed in the voters books as shown by the list taken therefrom." This section, taken all together and construed in the light of those which follow it, means that although a person falsely took the voter's oath and thus obtained permission to register, he may nevertheless lawfully vote at a given election, if, before it is held, he removes his disqualification, convinces the registrars of this fact, and thus procures them to place his name on the list of registered voters for that election. If this is not true, some of its provisions are utterly without meaning and incapable of enforcement. It is too well settled to admit of question that if a statute can be so construed as to give effect to all of its language, this course must be pursued rather than adopt a construction which will render some of its language entirely ineffectual. If the name of one who has registered is placed upon a list of "disqualified voters," he may nevertheless have his name placed upon the list of registered voters, if he can, by sufficient legal proof, convince the registrars that he was not disqualified when he registered, "or that his disqualification has .been removed." How can the words last quoted be operative for any purpose, if the view we take of the law is not correct? After the most anxious and careful consideration, we have been unable to find a satisfactory answer to this question other than the ruling above announced.

Sections 55 and 56 provide machinery for the obtaining and introduction of evidence before the registrars. In the former it is provided that they may hear testimony "concerning the removal of the disqualification of any person whose name appears on the list of disqualified voters"; and in the latter they are given the power to require the production of books and papers "for the purpose of determining the qualification of persons as aforesaid." If persons who have registered and whose names are placed on the list of disqualified voters may lawfully pursue the course above indicated, certainly those who have registered and who have not been returned as "disqualified," but whose right to have their names placed upon the list of registered voters is questioned by the registrars, may do

likewise. It would never do to hold that they occupy a position inferior to that of those who have been officially listed as persons who were entitled to register. Indeed, the registrars can not lawfully withhold from a list of registered voters the name of any person appearing upon the voters book, and not appearing on the list of disqualified voters, unless "convinced by sufficient legal proof that such person is, in fact, not qualified to vote." See again, § 54. The language quoted is very significant. In the case of such a person, the inquiry is, not *did* he register unlawfully, but *is* he *now* qualified to vote? If so, it would seem that his name *must* be placed on the registered voters list without regard to the question whether he was entitled to sign the voters book or not.

There can, of course, be no doubt that those whose names are placed on that list and who are in fact qualified voters have the right to vote; and if so, it follows that their votes ought to be counted. It was in the argument here strenuously urged that the General Assembly could not have intended that a man who swore falsely and thus unlawfully got his name on the voters book should thereafter have the right to remove his disqualification and become a legal voter. To allow this would, it was contended, put a premium on crime and open the way to indiscriminate and corrupt registration. We are nevertheless constrained to hold that the legislature has declared that just such a man shall have such a right; and it is not difficult to suggest good reasons why the lawmaking power should have done so. It does not follow that a man who falsely took the voter's oath necessarily did so in bad faith. It is easy to suppose that one might do this in the honest belief that he was neither a tax defaulter nor otherwise incompetent to vote. The General Assembly might very justly have thought that in a case of this kind the person registering ought not to be deprived of the privilege of subsequently qualifying and exercising the elective franchise. It may also have concluded that whether a man who registered took the oath honestly or corruptly, it would be a wise policy to grant this privilege; for the principal cause of disqualification is non-payment of taxes, and allowing the defaulter to pay up so as to obtain the right to vote could very properly be regarded as a good revenue measure. As to the danger of too much looseness in registration, it may be remarked that the penal statute against false swearing in order to register (Penal Code, § 625) is appli-

cable in the case of one who removes his disqualification, and will, it is to be presumed, exercise a salutary check upon reckless swearing in this regard.

It results from the conclusions above expressed that the court erred in vacating the order for a recount of the ballots and in dismissing the petition.

*Judgment reversed. All the Justices concurring.*