34735. STATE OF GEORGIA *et al. v.* CHEROKEE BRICK & TILE CO.

DECIDED OCTOBER 14, 1953—REHEARING DENIED NOVEMBER 18, 1953.

*Eugene Cook, Attorney-General, Geo. E. Sims, Jr., Lamar W. Sizemore, F. H. Boney, Assistant Attorneys-General,* for plaintiff in error.

*Block, Hall, Groover & Hawkins,* contra.

*Jones, Williams, Dorsey & Kane,* amicus curiae.

CARLISLE, J. 1. The sole question for determination is whether or not the natural gas used in the manner alleged in the petition comes within the exemption provision of section 3 (c) 2 of the act of 1951 (Ga. L. 1951, pp. 360, 365), which provides: "The terms 'sale at retail,' 'use,' 'storage,' and 'consumption' shall not include the sale, use, storage or consumption of industrial materials for future processing, manufacture or conversion into articles of tangible personal property for resale where such

industrial materials become a component part of the finished product nor shall such terms include industrial material, other than machinery and machinery repair parts, that are used directly in the fabricating, converting, or processing of articles of tangible personal property or parts thereof for resale, nor shall such terms include materials, containers, labels, sacks or bags used for packaging tangible personal property for shipment or sale." If it does fall within that provision then the corporation is entitled to the refund, and the trial court did not err in overruling the general and special demurrers of the defendants. If it does not fall within the provision, then the converse is true.

It is entirely clear that the General Assembly intended to tax natural and artificial gas when sold to any purchaser for purposes other than resale. By the terms of the act itself it is provided: "For the purpose of the tax imposed by this Act, these terms [retail sale and sale at retail] shall include . . . (a) The sale of natural or artificial gas . . . when made to any purchaser for purposes other than resale." Section 3 (c) 1.

It is not so entirely clear, however, whether the natural gas used by the plaintiff in the manner alleged in its petition comes within the exemptions provided in section 3 (c) 2. Does the manner in which the gas is alleged to have been used by the plaintiff make it an industrial material for future processing, manufacture, or conversion into articles of tangible personal property for resale, where such industrial material becomes a component part of the finished product? Or, does the manner in which the gas is alleged to have been used by the plaintiff make it an industrial material that is used directly in the fabricating, converting, or processing of articles of tangible personal property or parts thereof for resale?

The first of the two foregoing questions may be disposed of summarily, as it is nowhere contended in the petition that the gas used by the plaintiff as an industrial material became a component part of the finished brick, nor are there facts in the petition from which such a contention may be inferred.

Our problem is, therefore, narrowed to that of answering the latter of the two foregoing questions, namely, is the gas as used by the plaintiff in the manner alleged in the petition an industrial material that is used directly in the fabricating, converting,

or processing of articles of tangible personal property or parts thereof for resale? To answer this question requires a proper construction of the statute, with particular reference to section 3 (c) 2, which is an exemption-from-taxation section.

In *Cherokee Brick & Tile Co.* v. *Redwine,* 209 *Ga.* 691 (75 S. E. 2d 550), in considering another exemption provision of the same act presently under consideration, the Supreme Court stated the rule of construction applicable to such provisions thus: "Under our law any ambiguity in an alleged exemption from taxation must be construed favorably to the State and against the taxpayer." And that court went on to say that the exemption will not be held to be conferred unless the terms under which it is granted clearly and distinctly show that such was the intention of the legislature.

It is inadmissible to mutilate a statute by lifting a mere segment out of its context and construing it without consideration of all other parts of the act. *Thompson* v. *Talmadge,* 201 *Ga.* 867 (41 S. E. 2d 883). The intention of the legislature is to be gathered from the statute as a whole so as to give effect to each of its parts and at the same time harmonize, if possible, the component parts. *Drake* v. *Drewry,* 109 *Ga.* 399 (35 S. E. 44) ; *Ford Motor Co.* v. *Abercrombie,* 207 *Ga.* 464, 467 (62 S. E. 2d 209). And in determining such intention, the words of the statute are to be given their ordinary and usual signification. Code § 102-102 (1).

In section 3 of the act of 1951, the General Assembly is defining terms, and it says that certain words, terms, and phrases, when used in the act, shall have certain ascribed meanings, except when the context clearly indicates a different meaning; and in a subparagraph of that section (3(c)3(i)), the term "tangible personal property" is, in a most comprehensive definition, defined as personal property "which may be seen, weighed, measured, felt, or touched, or is in any other manner perceptible to the senses." We think that from the language of section 3(c)1, and the subparagraphs thereto, it is self-evident that the General Assembly is saying that the terms "retail sale" or "sale at retail" shall include sales to consumers or other persons for any purpose other than resale of *any and all* tangible personal property; *but* lest our definition of tangible personal property, all-inclusive and

comprehensive though it be, become a fruitful source of litigation, we want it specifically understood that, included within that definition, are all those items enumerated in subparagraphs (a), (b), and (c), and natural and artificial gas are included in this precautionary enumeration.

Now, conceding that the General Assembly has in section 3 (c) 1 and the subparagraphs thereto evinced an intent to tax retail sales and sales at retail of *all* tangible personal property where sold to a consumer or to any other person for any purpose other than resale, in section 3 (c) 2 the General Assembly begins its enumeration of items of tangible personal property which shall be exempt from the tax, and in subparagraphs (a) through (g) certain items of tangible personal property (and certain services) are specifically listed. The enumeration of exempted items in the subparagraphs of this section does not concern us here. However, in section 3 (c) 2 itself there are *three* classes of tangible personal property which, depending upon the use to which it is put or the manner in which it is used, may be exempt from taxation. With the third of these three classifications (materials, containers, labels, sacks or bags used for packaging tangible personal property for shipment or sale) we are not here concerned; nor are we concerned with the first of these classifications, save as the meaning of the first bears upon the meaning of the second. These first two classifications deal with "industrial materials," which term is not especially defined in the act. The *first* classification exempts from taxation the sale, use, storage, or consumption of industrial materials for future processing, manufacture, or conversion into articles of tangible personal property for resale where such industrial materials become a component part of the finished product; or, to state this first classification more simply, all industrial materials which become and remain component parts of the finished product are exempt from taxation. The second classification exempts from taxation the sale, use, storage, or consumption of industrial materials, other than machinery and machinery parts, that are used directly in the fabricating, converting, or processing of articles of tangible personal property or parts thereof for resale; or, to state this classification more simply, all industrial materials which are used directly in the manufacturing process are exempt from taxation.

It will be observed at once that the three classifications contained in section 3 (c) 2 are disjunctive each of the other rather than appositive; that is, the classifications are distinct. The first classification has been disposed of on the ground that there is no contention that the gas became a component part of the brick. What then did the General Assembly mean when it inserted the second classification, industrial material *used directly* in fabricating, converting, and processing? It could not have meant by this classification industrial material which became a part of the finished product. That class of industrial material had just been covered in the first classification wherein the industrial material becomes a component part of the finished product.

While there is much discussion pro and con in the briefs of counsel for the plaintiff and for the defendants on the question of whether gas is an industrial material, in view of the well-known fact that in the chemical industries many gases become component parts of the finished chemical products, we think it must be conceded that gas is an industrial material within the meaning of the first classification in section 3 (c) 2, and the term "industrial material," as used in the first classification, must necessarily mean the same thing in the second classification as in the first, since no language is used in the second classification which would indicate a different intention on the part of the General Assembly.

We are finally, therefore, confronted with the real and only question in this case. Is the industrial material (gas), as used by the plaintiff in the manner alleged in the petition, *used directly* in the manufacturing process? Under a construction of the statute most favorable to the State, we think not. Counsel for the plaintiff and for the defendants seem readily to concede that electricity which is used for mechanical energy or for motive power, and gas and other fuels which are used to generate mechanical energy or motive power, are indirectly rather than directly used in the manufacturing process, and therefore are not exempt from taxation. We perceive no difference between the indirection of those uses and the use of electricity or gas to generate heat to produce physical or chemical changes in raw material in order to produce the finished product. The gen-

erated energy produces motive power, which drives the machine that produces the finished product in one instance, and the generated energy produces heat, which produces the physical and chemical changes in the raw material that produces the finished product in the other. Both are indirect.

It follows, therefore, that the gas as used in the manner alleged in the petition is not directly used in the manufacturing process of brick and clay products within the meaning of section 3 (c) 2 of the act of 1951, and its sale, use, and consumption is not exempt from taxation; and, consequently, the plaintiff is not entitled to the refund claimed and the trial court erred in overruling the general demurrer to the petition for refund.

Were we not strong enough to stand alone upon our own construction of our own statute, we need look no further afield for support in our position than to our sister State of Tennessee, whose sales tax act served as a model for our own. The section of the Tennessee act and the section of the Georgia act presently under consideration are almost identical, and the Supreme Court of Tennessee in Phillips & Buttorff Mfg. Co. *v.* Carson, 188 Tenn. 132 (217 S. W. 2d 1), in passing upon the question, among others, of whether coal and fuel oil which was used to heat and maintain enameling solutions at uniform temperatures was exempt from taxation, readily held, under the same rules of statutory construction as obtain in this State, that such a use of coal and fuel oil was not a *direct* use within the meaning of the Tennessee exemption-from-taxation section of their sales tax act, and said: "When words are used in a statute defining the limits of an exemption, we cannot, under the guise of interpretation, enlarge the scope of the exemption. On the contrary 'all doubts must be resolved in favor of the State and against the exemptions.'" Though the Tennessee decision be persuasive authority only, we are impressed that the rules of statutory construction are the same in the two States and that, under an application of those rules to the two almost identical sections of the two sales tax acts, this court has reached the same conclusion as the Tennessee court in determining the intent of the legislatures. We think that the reasoning in that case is sound and have no hesitancy in following it in the present case.

We have not found it necessary, in determining the intention

of the General Assembly, to advert to either the regulations of the Revenue Commissioner, or the act of 1953 (Ga. L. 1953, p. 194). Indeed, we think that any reference to the act of 1953 is inadmissible for that purpose, as the tax period in controversy predates the passage of that act.

Pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L. 1945, p. 232), requiring that the whole court consider any case in which one of the judges of a division dissents, this case was considered and decided by the court as a whole.

*Judgment reversed. Sutton, C. J., Gardner, P. J., Felton and Quillian, JJ., concur. Townsend, J., dissents.*

TOWNSEND, J., dissenting. I think the plain meaning of that part of section 3 (c) 2 of the act of 1951 (Ga. L. 1951, pp. 360, 365) which reads, "The terms 'sale at retail' . . . shall not include . . . industrial materials . . . used directly in the . . . converting or processing of articles . . . for resale," is to include all industrial materials which, while they do not become component parts of the finished product, are applied directly against or in contact with the raw material in order to convert or process it. The mere fact that heat is applied at the same time, so that the gas, while in such contact with the clay, becomes ignited and itself consumed by chemical change, does not change the direct use of such gas to an indirect use, as the flaming gas is in direct contact with the material and is the agent of its conversion and processing.

It is axiomatic that the cardinal rule of construction is to ascertain the intention of the legislature. *Foster* v. *Vickery,* 202 *Ga.* 55, 60 (42 S. E. 2d 117). One unversed in the subtleties of the law might suppose that the proper manner of ascertaining such intent would be to consult the official subsequent declaration of that body, which, at the following term, passed an act (Ga. L. 1953, p. 194), "to provide for a clarification of the original intent of the General Assembly that there shall not be included within the meaning of the term 'industral materials', natural or artificial gas, oil, gasoline, electricity, solid fuel, ice or other materials used for heat, light, power and refrigeration." Such, however, is not the case, for the subsequent act must result in "either a new rule or a judicial construction of an existing

rule. If the former, it is . . . without retrospective effect, and, if the latter, it is the exercise of a power which belongs to the legislature of no free country—which most assuredly does not belong to the legislature of Georgia." *Wilder* v. *Lumpkin*, 4 *Ga.* 208, 211. It will not be presumed that the legislature attempted illegally to invade the judicial field. Accordingly, the plain implication is that, when the wording of section 3 (c) 2 was changed in 1953 to delete from the exemptions the words "industrial materials . . . used directly in the . . . converting or processing of articles," and substituted in lieu thereof "industrial materials . . . coated upon or impregnated into the product," it set up a new rule, regardless of its purported clarification of the original rule. Thus, viewing the act of 1953 through the back door, so to speak, instead of admitting it into the councils of judicial construction, we conclude from it only that the legislature, realizing it had enacted a statutory rule other than that which it had desired, in 1953 enacted a new statutory rule more in accordance with the purpose of the act as a whole. From what the legislature did, rather than from what it stated at a later date it intended to do, must the courts arrive at legislative intention. Applying this rule, it is clear that in 1952, when the tax for which refund was claimed was paid, gas, electricity, and other similar products, when used as industrial materials directly in the conversion or processing of raw materials, were exempt from the sales tax, and that the judgment of the trial court in this case was correct.

## On Motion for Rehearing.

Carlisle, J. We have been forcefully impressed with the earnestness and vigor with which counsel for the defendant endeavor to sustain, as the true legislative intent, their interpretation and construction of the act of 1951; and, as there seems to be some disparity of understanding between the court and counsel of the primary physical laws applicable in the case, and, as there is much insistence that, had the court adverted to the rules and regulations of the Commissioner of Revenue in its determination of the legislative intent, the result would have been different—the court will undertake to elaborate upon and to clarify the original decision, and to answer some of the objections lodged against it in the motion for rehearing.

We think that we hardly need say that the court, when it has before it the question of the legislative intent in passing a given statute, is not restricted in its determination of that intent to a choice between the respective theories of the parties. If such were the case, the legislative intent in passing any given statute might well be held to be different in every case, depending, as it were, upon the theories urged by the respective parties in a case. We cannot believe that counsel intend to urge such a complaint seriously.

That counsel did or did not concede "that electricity which is used for mechanical energy or motive power, and gas and other fuels which are used to generate mechanical energy or motive power, are indirectly rather than directly used in the manufacturing process and are, therefore, not exempt from taxation," would have in neither event varied the result reached by the court in this case. We would like, however, in view of the denial of the concession, to suggest that counsel has, no doubt, forgotten that, upon oral argument of the case before this court and in reply to questions posed by the court at that time, counsel readily conceded that electricity used to operate cotton-mill machinery in the manufacture of cloth was an indirect and taxable use of electricity, and that the same would be true of other fuels used in that manner. The court readily understands how in the heat of debate such minor concessions may be forgotten.

The use of the rules and regulations of the Commissioner of Revenue, as counsel insists we must use in arriving at the legislative intent, results only in hoisting the defendant upon its own petard. Regulation 15, entitled "industrial materials," provides: "Exempt industrial materals are divided into three categories: [The second category is Regulation 15 (2)]: Industrial materials (other than machinery and machinery repair parts) that are consumed directly in the fabricating, converting or processing of articles of tangible personal property or parts thereof for resale. This category includes essential materials in the manufacturing process which are in direct contact with and are in such relation to the goods in process of manufacture that *there is no intervention of any person or thing,* yet they do not become a component part of the finished product. This category does not include materials and supplies which are incidental to the

process. Examples of materials exempt in this category are: compounding oils, chemicals, solvents, dyes, anodes, catalysts, filtering materials and other similar items." (Italics added.) We can demonstrate at once by one simple illustration that giving effect to this regulation will not bring the gas used in this case in firing the brick within the meaning of the statutory exemption. We think that it is beyond question that the defendant purchased gas and not flaming gas. We think it beyond question that the tax is upon the sale, use, and consumption of gas, not flaming gas. The defendant does not allege that the gas, in the state in which it necessarily is delivered to it, is used and consumed in direct contact with the brick in the manufacturing process, but alleges that flaming gas is so used. We think it ineluctable that the ignition of the gas, the combustion, the fire, intervene, and Regulation 15 says that, to come within its classification as an industrial material exempt from the tax, there must be *no intervention of any person or thing*. It is not the gas in its quiescent state which serves as the chemical or catalyst in the process of manufacturing brick. It is the heat from the flaming gas which performs that function. While it may be true as counsel suggest that no human agency can prevent flaming gas from baking clay into brick if it is in contact with the clay, the argument is only a negative aspect of the problem and beside the point, and we think that we may reply to the argument with considerably more logic and bearing on the question that we know of no process by which gas in its quiescent state, although in contact with the clay, will convert the clay into brick without the intervention of the spark, the combustion, the flame, the heat. Does the gasoline drive the automobile without more? Indeed not. There must be the conversion of it into spray or vapor, its ignition, its combustion, expansion, and conversion into mechanical energy and motive power.

Counsel seem to think that we have committed fundamental and egregious error in separating the flame and the heat. To do otherwise would be to ignore what we take to be well known laws of nature, the principles of heat transference by radiation, convection, and conduction, and, moreover, it was not so much our intention to separate the heat from the flame—though they are separable—as to separate the gas from the heat. The flame

is the intervenor, or converter. Furthermore, though the principles of thermodynamics may be Greek to those of us who are not versed in the field, it is well known to all that rubbing two pieces of metal together, or other objects, will produce heat in the total absence of flame or fire. The court was fully aware of these "primary physical laws," and we think applied them correctly, and we will not presume an ignorance of these laws on the part of the legislature, in passing the act of 1951, greater than ours.

Counsel suggest that from the original pleadings in the case of Phillips & Buttorff Mfg. Co. *v.* Carson, supra, which were not set forth in the opinion of the Supreme Court of Tennessee, it is apparent that the Commissioner of Revenue of Tennessee admitted that wood and coke, used to fire the manufacturer's blast furnace, and welding gases and rods, which come in direct and immediate contact with the product being manufactured, were exempt from taxation, and that the chancellor ruled in conformity with that admission, and the Supreme Court of Tennessee affirmed that ruling by the following language: "We deem it unnecessary to make any further reference to these items [the items mentioned above conceded to be exempt from taxation by the Commissioner of Revenue of Tennessee], or the reasons for adjudging them to be exempt other than to agree with the conclusion reached." Assuming the appellate procedure of Tennessee to be the same as ours in the absence of knowledge to the contrary, the language of the court quoted above is pure obiter dictum. The assignments of error on appeal were three, and the question of whether coke, wood, welding gases, and welding rods were taxable or exempt from taxation was not raised by any of the three assignments of error, as is clear from the reported decision. It is also clear that the Supreme Court of Tennessee recognized that its comment on those items was obiter, as the language quoted above is immediately preceded by this: *"Before giving consideration to the assignments of error* [of which there were only three] *it is proper to observe that the Commissioner in the lower court conceded that some of the materials upon which the tax had been collected were exempt."* (Italics and brackets added.) If, however, we may indulge in conjecture, as we do not know what reasons were assigned by the

commissioner of revenue or the chancellor in the lower court for exempting the items in question from taxation, and assume, for the sake of argument, that this obiter is indicative that the Supreme Court of Tennessee held the coal and fuel oil used to maintain the enameling solutions at uniform temperatures to be taxable, as an indirect use of them, simply because the *container* in which the solution was heated constituted the "intervening thing," then that court has failed to perceive, as do we, that fire is a *thing* in that it is perceptible to the senses.

Having given full and thorough consideration to all of the arguments presented by the motion for rehearing, none of which causes us to waver from our original interpretation of the act of 1951, we adhere to the original judgment entered in this case.

*Rehearing denied. Sutton, C. J., Gardner, P. J., Felton, Townsend, and Quillian, JJ., concur.*