## 48168. BLACKMON v. ATLANTIC STEEL COMPANY.

ARGUED JUNE 29, 1973 — DECIDED DECEMBER 5, 1973 — REHEARING DENIED DECEMBER 19, 1973 —

*Arthur K. Bolton, Attorney General, Richard L. Chambers, Timothy J. Sweeney, Gary B. Andrews, Assistant Attorneys General,* for appellant.

*Jones, Bird & Howell, Trammell E. Vickery, Edward R. Kane,* for appellee.

EBERHARDT, Presiding Judge. John A. Blackmon, as State Revenue Commissioner, appellant, on July 27, 1971, made an assessment for sales and use tax deficiencies against Atlantic Steel Company, appellee, for the taxable period from July, 1967, through December 31, 1970, for tax, penalty and interest. The taxpayer entered its appeal to the Superior Court of Fulton County where, upon stipulated facts, the case was submitted to the trial judge for decision. The trial judge decided in favor of the taxpayer and the commissioner appealed. The assessment of the commissioner was based upon his finding that certain molds, stools, and electrodes, used by the taxpayer were taxable. The stipulated facts, in brief, follow.

Atlantic Steel is engaged in the business of making and selling steel and steel products. It makes steel in electric-arc furnaces. Charge materials, consisting of scrap metal and other ingredients, are placed into the melting vessels, and a powerful charge of electricity is transmitted through graphite (crystallized carbon) electrodes in such a manner that an electric-arc is formed between the electrodes and the scrap metal in the vessel. The arc creates tremendous heat, causing the scrap metal and other ingredients in the vessel to turn into molten metal. Undesirable elements are drawn off the molten metal and other elements are added as needed to produce the desired grade of steel. The molten metal is then poured into formed receptacles, called "molds" and "stools," where the metal hardens into the form of a steel ingot. After the steel ingot is hardened in the mold, the ingot is punched out of the

mold for further processing. The carbon content of steel produced by taxpayer, depending on the customer's particular order and other factors relating to the process itself, varies from .05 percent to an excess of 1 percent, but less than 2 percent of the total metal produced in the melting vessel. Each process with respect to one vessel of raw materials produces approximately 85 tons of steel. Metal containing an excess of 2 percent carbon is generally designated as iron.

Electrodes are cylindrical in shape, approximately five feet in length, with a threaded tip at one end and a threaded hole at the other, and, except as hereinafter stated, are used to conduct electricity. Several electrodes fitted together are placed in and attached to an electrode holder, or clamp, which permits continuous lowering of the electrodes as they are consumed. Three series of electrodes are employed by taxpayer for each operating process with respect to a vessel. Electrodes weigh approximately 13,000 pounds each and are composed solely of graphite (crystallized carbon) which serves as a conductor of electricity.

In Atlantic Steel's process, the melting vessel is filled with various types of scrap metal and placed under the electrode holder. Prior to the melting process, the taxpayer estimates the carbon content of scrap metal employed, and includes in the charge materials placed in the vessel metals with high carbon content, including cracked molds and stools and retrieved but unsalvageable broken electrodes, to bring the estimated carbon content of the mixture within the desired range. The tips of the electrodes are lowered to within four to six inches of the surface of the scrap metal and electricity is discharged through the electrodes so that an arc forms between the tip of the electrode and the scrap metal. The heat thus produced melts the scrap metal.

After the charge is melted, the resulting molten bath is tested for carbon content. If excess carbon is detected, oxygen is blown into the bath to remove the excess carbon by forming carbon dioxide gas. If a carbon deficiency is determined, taxpayer adds carbon, using coke if the amount of carbon needed is small, and if the amount of carbon to be added is large, the electrodes are dipped into the bath, this being the only instance where the electrodes are intentionally dipped into the bath. Taxpayer's consumption of electrodes by "dipping" represents approximately six percent of its total consumption of electrodes, which causes the ends of the electrodes to melt into the molten metal and increases the carbon content of the molten metal.

In the course of an operation, a piece of electrode may and does break off and fall into the bath. A large piece which has broken is retrieved by a clamp. A small piece is allowed to remain in the bath to melt therein. If the piece retrieved is of salvageable size, it is rethreaded and employed again as an electrode. If the piece retrieved is not salvageable, it is used as a source of carbon by adding it to the charge material. The consumption of irretrievable or retrieved but unsalvageable broken electrodes as part of the bath is approximately nine to ten percent of taxpayer's consumption of electrodes, and this is done in order to bring the estimated carbon content of the molten metal within the desired range.

Consumption of electrodes results partly from breakage, partly from dipping in the bath, from oxidation (combining with oxygen) or volatilization (changing solid carbon to carbon gas) occurring while the electrode is employed in conducting electricity. Taxpayer estimates that 42 percent of the carbon in the electrodes, after volatilizing into carbon gas, enters temporarily into the bath before re-emerging and being dissipated into the atmosphere. The entry of carbon gas into the bath is caused by the force of the flow of electricity drawing the carbon gas into the bath. The impregnation of carbon into the molten metal is an integral part of the electrochemical process that takes place in the electric furnaces and is indispensable to the steel making operation.

When electrodes are purchased by Atlantic Steel, it is planned and intended by Atlantic Steel that they will be used in the manner described above. If Atlantic Steel did not use electrodes to add carbon to the molten steel in the electric furnaces, it would have to purchase and use other materials for that purpose.

The useful life of an electrode, as an electrode, is approximately 48 hours. During the course of that life, the electrode will be used during approximately 15 operations producing 15 vessels of steel of approximately 85 tons each.

Molds and stools are composed of cast pig iron. A mold is an oblong shaped, hollow form open at both ends. It rests on a stool, which serves the function of capping one end. A stool is a piece of pig iron cast in such shape that it can be fitted onto one end of the mold.

The bath of molten metal is poured from the melting vessel into a ladle and then poured into molds which are fitted with stools. There it is allowed to solidify. Once the steel has solidified, it is punched from the mold for further processing. One vessel of steel

fills approximately 16 molds.

A mold or stool may and does crack during the course of its use by taxpayer due to the stress incurred in use. A cracked mold or stool is no longer usable as such and when, but only when, a mold or stool does crack, taxpayer employs it as raw material in the steel making process.

The average useful life of a mold or stool as such is approximately two months. During a two-month period taxpayer produces approximately 780 vessels of steel consisting of approximately 85 tons each.

Taxpayer used molds and stools as raw materials, as described above, during the periods included in the assessment, except that during the calendar year 1970 approximately 28 percent of the cracked molds and stools were sold by it as pig iron.

Atlantic Steel purchases molds and stools with the intention of using them as molds and stools until they are no longer usable as such. It is also taxpayer's intention, when purchasing the molds and stools, to use them as raw materials in the electric furnaces operated by it when they are no longer usable for their original purposes. If the molds and stools were not used as scrap materials after they become unusable as molds and stools, taxpayer would have to purchase other raw materials.

In the present state of the electric arc steel making science, pig iron is, in every sense of the word, the best material for making receptacles for molding molten steel. There is no existing substitute. Taxpayer would use molds and stools made of pig iron even if a secondary use of pig iron as a raw material was not available to it.

Taxpayer purchases electrodes with the intent that such electrodes will be used in the manner set out above. If it did not use the electrodes to add carbon to the bath, as noted above, taxpayer would have to purchase and use other materials to add such carbon.

In the present state of the electric arc steel making science, graphite is, in every sense of the word, the best material for conducting electricity to form the electric arc. There is no existing substitute. Taxpayer would use graphite electrodes even if they could not be used to provide carbon to the bath through dipping and breakage, or otherwise.

Atlantic Steel claimed an exemption from liability based upon Section 3 (c) 2 of the Georgia Retailers' and Consumers' Sales and Use Tax Act (Ga. L. 1951, p. 360; Code Ann. § 92-3403aC (2)).

■ The portion of the tax statute (Georgia Retailers and Consumers Sales & Use Tax Act, Ga. L. 1951, p. 360 et seq., as amended), which sets forth certain exemptions, being Section 3 (c) 2 of the Act as amended (Code Ann. § 92-3403aC (2)), reads as follows: "The terms 'sale at retail,' 'use,' 'storage,' and 'consumption' shall not include the sale, use, storage or consumption of industrial materials for future processing, manufacture or conversion into articles of tangible personal property for resale where such industrial materials become a component part of the finished product nor shall such terms include industrial materials, other than machinery and machinery repair parts, that are coated upon or impregnated into the product at any stage of its processing, manufacture or conversion, nor shall such terms include materials, containers, labels, sacks or bags used for packaging tangible personal property for shipment or sale. To qualify for the packaging exemption, such items shall be used solely for packaging and shall not be purchased for reuse: Provided, however, the term 'industrial materials' shall not include natural or artificial gas, oil, gasoline, electricity, solid fuel, ice or other materials used for heat, light, power or refrigeration in any phase of the manufacturing, processing or converting process." The taxpayer contends that the molds, stools and electrodes are exempt as industrial materials under this portion of the statute.

The exemption applies only to "industrial material." *State of Ga. v. Cherokee Brick &c. Co.,* 89 Ga. App. 235 (79 SE2d 322); *Blackmon v. J. D. Jewell, Inc.,* 126 Ga. App. 679 (191 SE2d 621). We will consider first the questions relating to the molds and stools. These items were bought as molds and stools, not as scrap iron. That the purchaser, at the time of purchase, intended to use these molds and stools as an industrial material when they became unusable for the purpose originally purchased; that is, when because of breakage they became scrap iron instead of molds and stools does not show *molds* and *stools* were industrial materials. We are not at this point concerned with a situation where tangible personal property is bought and used partly for two purposes, one of which is as an exempt, industrial material. See in this connection, Michigan Allied Dairy Assn. v. State Board, 302 Mich. 643 (5 NW2d 516); State v. Southern Kraft Corp., 243 Ala. 223 (8 S2d 886); State v. U. S. Steel Corp., 281 Ala. 553 (206 S2d 358); Morley v. Brown & Root, Inc., 219 Ark. 82 (239 SW2d 1012); and Dain Manufacturing Co. v. Iowa State Tax Commr., 237 Iowa 531 (22 NW2d 786).

The stools and molds involved in the present case were not

industrial materials when purchased, neither were they used as industrial materials in the state or condition in which they were first purchased, nor were they, as a part of the manufacturing process, converted by the taxpayer into industrial materials from the state in which originally purchased. It is only when the molds and stools became broken and unfit for use as molds and stools that they became scrap iron, and industrial material, and a part of the ultimate product manufactured by the taxpayer. If the argument of the taxpayer has validity, then the tax ordinarily paid for the purchase of expensive tools bought at a higher price might be avoided by using the broken tools as "scrap iron" in the process of manufacturing steel.

We hold, therefore, that the trial court erred in its ruling that the sales tax was not applicable to the molds and stools. See Union Portland Cement Co. v. State Tax Commission, 110 Utah 135 (170 P2d 164), which, while not completely on all fours with the present case, its rationale does apply to what has been said above.

■ The question relating to the electrodes involves, in part, a different and somewhat more difficult question. If the decision depended solely upon whether the broken pieces of the electrode put into the metal bath were sufficient to prevent the electrodes from being taxable, the ruling above as to the molds and stools would apply. We have two differences as far as the electrodes are concerned. (a) Carbon gas, created by the intense heat of the electric arc, goes into the molten metal, leaving some carbon in it, but is largely dissipated or oxidized. (b) For supplying the proper carbon content of the steel the electrodes are dipped into the molten mass. Sometimes they break off, falling into it, and if tests should indicate that the content is insufficient, broken and used electrodes are added to increase it. If the content is too high, it is removed by oxidation. The electrodes are totally consumed in the steel making process, and are the principal source from which the required carbon content is supplied.

The ruling in *Hawes v. Bibb Manufacturing Co.*, 224 Ga. 141 (160 SE2d 355) that an oil impregnated in a fibre as a necessary part of the manufacuturing process and then removed is not taxable has application to the situation here.

The taxing statute, after defining the exempt "industrial materials" then reads: "Provided, however, the term 'industrial materials' shall not include natural or artificial gas, oil, gasoline,

electricity, solid fuel, ice or other materials used for heat, light, power or refrigeration in any phase of the manufacturing, processing or converting process."

At the hearing before the trial judge, counsel for the commissioner and the taxpayer stipulated that the electrodes do not constitute a fuel within the meaning of this portion of the statute. This we construe to be a stipulation of fact, and hence the parties are bound by it. Consequently, the electrodes, exempt as industrial materials by the portion of the statute preceding the proviso, are not brought back under it as a taxable item by the proviso on the theory that the electrodes are something in the category of "natural or artificial gas, oil, gasoline, electricity, solid fuel," etc.

Our conclusion that the electrodes are exempt is consistent with the administrative rulings made by the commissioner for many years past, enjoying legislative acquiescence, and to which we give great weight in our consideration of the matter. *Thompson v. Eastern Air Lines,* 200 Ga. 216, 224 (39 SE2d 225); *Undercofler v. Eastern Air Lines,* 221 Ga. 824, 831 (147 SE2d 436).

The trial court was correct in its ruling that the electrodes are exempt from the sales and use tax.

*Judgment affirmed in part; reversed in part. Bell, C. J., Hall, P. J., Deen, Quillian, Evans and Clark, JJ., concur. Pannell and Stolz, JJ., dissent.*

PANNELL, Judge, dissenting. I agree with Division 1 of the opinion. I dissent from Division 2 of the opinion holding that the carbon electrodes are industrial materials within the meaning of Section 3 (c) 2 of the Georgia Retailers and Consumers Sales and Use Tax Act, Ga. L. 1951, p. 360 (Code Ann. § 92-3403aC (2)). As I view it, the majority opinion leaves out essential facts, includes in the statement of the written stipulation of fact matters not stipulated, and considers as a "stipulation" statements of counsel for both parties made during arguments, which I construe were nothing but statements of a factual or legal opinion, not binding on the courts. This is what apparently led to what I consider the erroneous conclusion in Division 2 of the majority opinion.

The parties entered into a written stipulation submitting the case to be tried by the court sitting without a jury, which stipulation recited: "It is further stipulated that the following facts shall be taken as true on the trial of this case, subject to the right of either party to introduce other and further evidence not inconsistent with the facts herein stipulated." Stipulation No. 12

reads as follows *with material portions thereof underscored which are not included in the majority's statement of the contents of the written stipulation:* "Consumption of the electrodes results partly from breakage as noted above, partly from dipping in the bath as noted above, *and, except for such breakage and dipping, wholly* from oxidation (combining with oxygen) or from volatilization (changing from solid carbon to carbon gas) occurring while the electrode is employed in conducting electricity. Appellant estimates that 42% of the carbon in the electrodes, after volatilizing into carbon gas, enters temporarily into the bath before re-emerging and becoming dissipated into the atmosphere. The entry of carbon gas into the bath is caused by the force of the flow of electricity drawing such carbon gas into the bath. *The entry of such carbon gas is not a source of carbon in the steel making process.*" The underscored portions to this stipulation, which were not included in the majority opinion, are essential to a proper decision of this case, and call for an entirely different result as to the electrodes, and is directly contrary to statements of the majority in Division 2 of the opinion, such as "we have two differences as far as the electrodes are concerned. (a) Carbon gas, created by the intense heat of the electric arc, goes into the molten metal, *leaving some carbon in it,* but is *largely* dissipated or oxidized. (b) For supplying the proper carbon content of the steel the electrodes are dipped into the molten mass. Sometimes they break off, falling into it, and if tests should indicate that the content is insufficient, broken and used electrodes are added to increase it. If the content is too high, it is removed by oxidation. *The electrodes are totally consumed in the process,* and are the principal source from which the required carbon content is supplied."

The underscored words in this statement in the majority opinion, indicating some of the carbon gas remained in the metal bath as a part of the manufactured product, is contrary to the written stipulations, as well as the statement the entire electrode was consumed by dipping the electrode to put carbon in the metal bath and by using broken pieces of electrodes to add carbon to the metal bath. The written stipulation of facts shows that 6% of the electrode is consumed by intentional dipping, 9% to 10% from the addition of broken pieces of the electrode to the metal bath, 42% of the electrode is converted into carbon gas, and 42% of the electrode is dissipated directly into the air by oxidation, neither of the last two (a total of 84% of the electrode) supply any carbon content to

the metal.

Immediately after this failure to state all of the contents of stipulation No. 12, the majority opinion gives the following as a part of the written stipulations: "The impregnation of carbon into the molten metal is an integral part of the electro-chemical process that takes place in the electric furnaces and is indispensable to the steel making operation." *I can find no such statement or stipulation in the written stipulation of facts.* There is a similar statement in appellee's brief filed in this court, but it is not supported by the record. While a witness for the taxpayer testified that the entry of the 42% of the carbon into the molten metal by arc transfer [carbon gas] is an integral part of the electro-chemical process that takes place in the electric furnaces and is indispensable to the steel making operation, this testimony was based upon his concept that tiny particles of carbon gas are impregnated into and remained in the molten metal. This concept is in conflict with the written stipulation that the carbon gas was not a source of carbon in the steel making process. The stipulation clearly shows that the remaining carbon in the electrodes not impregnated into the bath by dipping 6% and putting broken pieces of electrodes therein (9 - 10%) is lost directly into the atmosphere through oxidation (42%), and by dissipation of the carbon gas (42%).

The majority opinion further states that the attorneys for both parties stipulated the electrodes were not a *fuel* within the meaning of the statute. This so-called stipulation occurred after the evidence was closed and upon arguments to the trial judge to whom the case had been submitted on written stipulations of fact and testimony of witnesses. The trial judge read the statute to the attorneys, which defined industrial materials exempt from tax and also the exceptions to third definition, and posed the question whether the electrodes under the evidence and the statute were within the exception terms of the statute. They both stated views to the negative, the attorney for appellee stating "we don't think it's a fuel." This constituted no stipulation of fact but was a mere expression of a legal opinion or a factual opinion as to what the evidence showed. To permit the parties to determine whether the electrodes are taxable or not taxable, either by an expression of an opinion of law, or the expression of an opinion as to the facts contrary to the uncontradicted proof in the record, is not controlling on this court in applying the law to the facts as they actually exist by written stipulation and uncontradicted testimony

of witnesses.

My views of a proper decision on the facts as thus corrected differ sharply from those of the majority, and after adopting the first two sentences of Division 2 of the majority opinion, are as follows: We have two differences as far as the electrodes are concerned. (a) Carbon gas goes into the molten metal but is dissipated and does not increase the carbon content of the metal in the bath, this carbon gas being created by the intense heat of the electric arc between the electrode and the metal. Since this carbon gas diffusion in the metal, which does not remain, is not a necessary part of the process of manufacturing the steel but is something that occurs incidental to that process, the ruling in *Hawes v. Bibb Manufacturing Co.,* 224 Ga. 141 (160 SE2d 355) that an oil impregnated in a fibre as a necessary part of the manufacturing process and then removed is not taxable has no application to the present case. The carbon gas, while an event in, is not a necessary part of, the manufacturing process. (b) The next element is the simultaneous use of the electrode as a heating element (which use is taxable), (*State of Ga. v. Cherokee Brick &c. Co.,* 89 Ga. App. 235, supra) and for impregnating carbon in the product by the dipping of the electrode into the metal bath, which melts the carbon in the electrode. Under these circumstances, I might be inclined to hold that the electrodes, by being simultaneously used for producing heat, a taxable use, and at the same time for impregnating carbon into the product, would be exempt as an industrial material from the sales tax, inasmuch as no provision is made in the Act as to a partial exemption or partial tax, except for the fact that, in my opinion, the Act expressly provides that the use of the electrodes for heating purposes prevents the electrode from being an "industrial material," as heretofore defined and exempted from tax in the Act. The undisputed testimony of one of the taxpayer's witnesses showed that the electricity created an electric arc between the electrode and the scrap metal, and the electrode produced carbon gas, which, when produced, stabilized and made more effective the heat thus created and used to melt the scrap metal. The taxing statute, after defining the exempted "industrial materials" then reads: "Provided, however, the term 'industrial materials' shall not include natural or artificial fuel, ice *or other materials used for heat,* light, power or refrigeration in any phase of the manufacturing, processing or converting process."

The trial court erred in ruling the electrodes were exempt from tax. While there are indications that a prior Commissioner of

Revenue, through administrative ruling, exempted these items from tax as to a particular taxpayer and until this present assessment was issued, did not enforce the tax, it is our opinion that the facts of this case clearly show that the tax is applicable and the prior administrative ruling should not be followed.

I am authorized to state that Judge Stolz concurs in this dissent.